*122 Justice Scalia
delivered the opinion of the Court.
We consider whether Michael and Chantell Sackett may bring a civil action under the Administrative Procedure Act, 5 U. S. C. § 500 et seq., to challenge the issuance by the Environmental Protection Agency (EPA) of an administrative compliance order under §309 of the Clean Water Act, 33 U. S. C. § 1319. The order asserts that the Sacketts’ property is subject to the Act, and that they have violated its provisions by placing fill material on the property; and on this basis it directs them immediately to restore the property pursuant to an EPA work plan.
HH
The Clean Water Act prohibits, among other things, the discharge of any pollutant by any person,” § 1311, without a permit, into the “navigable waters,” § 1344 — which the Act *123 defines as “the waters of the United States,” § 1362(7). If the EPA determines that any person is in violation of this restriction, the Act directs the Agency either to issue a compliance order or to initiate a civil enforcement action. § 1319(a)(3). When the EPA prevails in a civil action, the Act provides for “a civil penalty not to exceed [$37,500] per day for each violation.”[1] § 1319(d). And according to the Government, when the EPA prevails against any person who has been issued a compliance order but has failed to comply, that amount is increased to $75,000 — up to $37,500 for the statutory violation and up to an additional $37,500 for violating the compliance order.
The particulars of this case flow from a dispute about the scope of “the navigable waters” subject to this enforcement regime. Today we consider only whether the dispute may be brought to court by challenging the compliance order— we do not resolve the dispute on the merits. The reader will be curious, however, to know what all the fuss is about. In United States v. Riverside Bayview Homes, Inc., 474 U. S. 121 (1985), we upheld a regulation that construed “the navigable waters” to include “freshwater wetlands,” id., at 124, themselves not actually navigable, that were adjacent to navigable-in-fact waters. Later, in Solid Waste Agency of Northern Cook Cty. v. Army Corps of Engineers, 531 U. S. 159 (2001), we held that an abandoned sand and gravel pit, which “seasonally ponded” but which was not adjacent to open water, id., at 164, was not part of the navigable waters. Then most recently, in Rapanos v. United States, 547 U. S. 715 (2006), we considered whether a wetland not adjacent *124 to navigable-in-fact waters fell within the scope of the Act. Our answer was no, but no one rationale commanded a majority of the Court. In his separate opinion, The Chief Justice expressed the concern that interested parties would lack guidance “on precisely how to read Congress’ limits on the reach of the Clean Water Act” and would be left “to feel their way on a case-by-case basis.” Id., at 758 (concurring opinion).
The Sacketts are interested parties feeling their way. They own a %-acre residential lot in Bonner County, Idaho. Their property lies just north of Priest Lake, but is separated from the lake by several lots containing permanent structures. In preparation for constructing a house, the Sacketts filled in part of their lot with dirt and rock. Some months later, they received from the EPA a compliance order. The order contained a number of “Findings and Conclusions,” including the following:
“1.4 [The Sacketts’ property] contains wetlands within the meaning of 33 C. F. R. § 328.4(8)(b); the wetlands meet the criteria for jurisdictional wetlands in the 1987 ‘Federal Manual for Identifying and Delineating Jurisdictional Wetlands.’
“1.5 The Site’s wetlands are adjacent to Priest Lake within the meaning of 33 C. F. R. § 328.4(8)(c). Priest Lake is a ‘navigable water’ within the meaning of section 502(7) of the Act, 33 U. S. C. § 1362(7), and ‘waters of the United States’ within the meaning of 40 C. F. R. §232.2.
“1.6 In April and May, 2007, at times more fully known to [the Sacketts, they] and/or persons acting on their behalf discharged fill material into wetlands at the Site. [They] filled approximately one half acre.
[[Image here]]
“1.9 By causing such fill material to enter waters of the United States, [the Sacketts] have engaged, and are continuing to engage, in the ‘discharge of pollutants’ from a *125 point source within the meaning of sections 301 and 502(12) of the Act, 33 U. S. C. §§ 1311 and 1362(12).
[[Image here]]
“1.11 [The Sacketts’] discharge of pollutants into waters of the United States at the Site without [a] permit constitutes a violation of section 301 of the Act, 33 U. S. C. § 1311.” App. 19-20.
On the basis of these findings and conclusions, the order directs the Sacketts, among other things, “immediately [to] undertake activities to restore the Site, in accordance with [an EPA-created] Restoration Work Plan” and to “provide and/ or obtain access to the Site . . . [and] access to all records and documentation related to the conditions at the Site . . . to EPA employees and/or their designated representatives.” Id., at 21-22, ¶¶2.1, 2.7.
The Sacketts, who do not believe that their property is subject to the Act, asked the EPA for a hearing, but that request was denied. They then brought this action in the United States District Court for the District of Idaho, seeking declaratory and injunctive relief. Their complaint contended that the EPA’s issuance of the compliance order was “arbitrary [and] capricious” under the Administrative Procedure Act (APA), 5 U. S. C. § 706(2)(A), and that it deprived them of “life, liberty, or property, without due process of law,” in violation of the Fifth Amendment. The District Court dismissed the claims for want of subject-matter jurisdiction, and the United States Court of Appeals for the Ninth Circuit affirmed, 622 F. 3d 1139 (2010). It concluded that the Act “precluded] pre-enforcement judicial review of compliance orders,” id., at 1144, and that such preclusion does not violate the Fifth Amendment’s due process guarantee, id., at 1147. We granted certiorari. 564 U. S. 1052 (2011).
II
The Sacketts brought suit under Chapter 7 of the APA, which provides for judicial review of “final agency action for which there is no other adequate remedy in a court.” 5 *126 U. S. C. § 704. We consider first whether the compliance order is final agency action. There is no doubt it is agency action, which the APA defines as including even a “failure to act.” §§551(13), 701(b)(2). But is it final? It has all of the hallmarks of APA finality that our opinions establish. Through the order, the EPA “ ‘determined’ ” “ ‘rights or obligations.’” Bennett v. Spear, 520 U. S. 154, 178 (1997) (quoting Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic, 400 U. S. 62, 71 (1970)). By reason of the order, the Sacketts have the legal obligation to “restore” their property according to an Agency-approved Restoration Work Plan, and must give the EPA access to their property and to “records and documentation related to the conditions at the Site.” App. 22, ¶2.7. Also, “‘legal consequences . .. flow’” from issuance of the order. Bennett, supra, at 178 (quoting Marine Terminal, supra, at 71). For one, according to the Government’s current litigating position, the order exposes the Sacketts to double penalties in a future enforcement proceeding.[2] It also severely limits the Sacketts’ ability to obtain a permit for their fill from the Army Corps of Engineers, see 33 U. S. C. § 1344. The Corps’ regulations provide that, once the EPA has issued a compliance order with respect to certain property, the Corps will not process a permit application for that property unless doing so “is clearly appropriate.” 33 CFR § 326.3(e)(l)(iv) (2011).[3]
*127 The issuance of the compliance order also marks the “ ‘consummation’ ” of the Agency’s decisionmaking process. Bennett, supra, at 178 (quoting Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp., 333 U. S. 103, 113 (1948)). As the Sacketts learned whéfi they unsuccessfully sought a hearing, the “Findings and Conclusions” that the compliance order contained were not subject to further Agency review. The Government resists this conclusion, pointing to a portion of the order that invited the Sacketts to “engage in informal discussion of the terms and requirements” of the order with the EPA and to inform the Agency of “any allegations [tjherein which [they] believe[d] to be inaccurate.” App. 22-23, ¶2.11. But that confers no entitlement to further Agency review. The mere possibility that an agency might reconsider in light of “informal discussion” and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal.
The APA’s judicial review provision also requires that the person seeking APA review of final agency action have “no other adequate remedy in a court,” 5 U. S. C. § 704. In Clean Water Act enforcement cases, judicial review ordinarily comes by way of a civil action brought by the EPA under 33 U. S. C. § 1319. But the Sacketts cannot initiate that process, and each day they wait for the Agency to drop the hammer, they accrue, by the Government’s telling, an additional $75,000 in potential liability. The other possible route to judicial review — applying to the Corps of Engineers for a permit and then filing suit under the APA if a permit is denied — will not serve either. The remedy for denial of action that might be sought from one agency does not ordinarily provide an “adequate remedy” for action already taken by another agency. The Government, to its credit, does not seriously contend that other available remedies alone foreclose review under §704. Instead, the Government relies on § 701(a)(1) of the APA, which excludes APA *128 review “to the extent that [other] statutes preclude judicial review.” The Clean Water Act, it says, is such a statute.
i — I h — 1 (* — I
Nothing in the Clean Water Act expressly precludes judicial review under the APA or otherwise. But in determining “[wjhether and to what extent a particular statute precludes judicial review,” we do not look “only [to] its express language.” Block v. Community Nutrition Institute, 467 U. S. 340, 345 (1984). The APA, we have said, creates a “presumption favoring judicial review of administrative action,” but as with most presumptions, this one “may be overcome by inferences of intent drawn from the statutory scheme as a whole.” Id., at 349. The Government offers several reasons why the statutory scheme of the Clean Water Act precludes review.
The Government first points to 33 U. S. C. § 1319(a)(3), which provides that, when the EPA “finds that any person is in violation” of certain portions of the Act, the Agency “shall issue an order requiring such person to comply with [the Act], or... shall bring a civil action [to enforce the Act].” The Government argues that, because Congress gave the EPA the choice between a judicial proceeding and an administrative action, it would undermine the Act to allow judicial review of the latter.' But that argument rests on the question-begging premise that the relevant difference between a compliance order and an enforcement proceeding is that only the latter is subject to judicial review. There are eminently sound reasons other than insulation from judicial review why compliance orders are useful. The Government itself suggests that they “providfe] a means of notifying recipients of potential violations and quickly resolving the issues through voluntary compliance.” Brief for Respondents 39. It is entirely consistent with this function to allow judicial review when the recipient does not choose “voluntary compliance.” The Act does not guarantee the EPA that is *129 suing a compliance order will always be the most effective choice.
The Government also notes that compliance orders are not self-executing, but must be enforced by the Agency in a plenary judicial action. It suggests that Congress therefore viewed a compliance order “as a step in the deliberative processf,] . . . rather than as a coercive sanction that itself must be subject to judicial review.” Id., at 38. But the APA provides for judicial review of all final agency actions, not just those that impose a self-executing sanction. And it is hard for the Government to defend its claim that the issuance of the compliance order was just “a step in the deliberative process” when the Agency rejected the Sacketts’ attempt to obtain a hearing and when the next step will either be taken by the Sacketts (if they comply with the order) or will involve judicial, not administrative, deliberation (if the EPA brings an enforcement action). As the text (and indeed the very name) of the compliance order makes clear, the EPA’s “deliberation” over whether the Sacketts are in violation of the Act is at an end; the Agency may still have to deliberate over whether it is confident enough about this conclusion to initiate litigation, but that is a separate subject.
The Government further urges us to consider that Congress expressly provided for prompt judicial review, on the administrative record, when the EPA assesses administrative penalties after a hearing, see § 1319(g)(8), but did not expressly provide for review of compliance orders. But if the express provision of judicial review in one section of a long and complicated statute were alone enough to overcome the APA’s presumption of reviewability for all final agency action, it would not be much of a presumption at all.
The cases on which the Government relies simply are not analogous. In Block v. Community Nutrition Institute, supra, we held that the Agricultural Marketing Agreement Act of 1937, which expressly allowed milk handlers to obtain judicial review of milk market orders, precluded review of *130 milk market orders in suits brought by milk consumers. 467 U. S., at 345-348. Where a statute provides that particular agency action is reviewable at the instance of one party, who must first exhaust administrative remedies, the inference that it is not reviewable at the instance of other parties, who are not subject to the administrative process, is strong. In United States v. Erika, Inc., 456 U. S. 201 (1982), we held that the Medicare statute, which'expressly provided for judicial review of awards under Part A, precluded review of awards under Part B. Id., at 206-208. The strong parallel between the award provisions in Part A and Part B of the Medicare statute does not exist between the issuance of a compliance order and the assessment of administrative penalties under the Clean Water Act. And in United States v. Fausto, 484 U. S. 439 (1988), we held that the Civil Service Reform Act, which expressly excluded certain “nonpreference” employees from the statute’s review scheme, precluded review at the instance of those employees in a separate Claims Court action. Id., at 448-449. Here, there is no suggestion that Congress has sought to exclude compliance-order recipients from the Act’s review scheme; quite to the contrary, the Government’s case is premised on the notion that the Act’s primary review mechanisms are open to the Sacketts.
Finally, the Government notes that Congress passed the Clean Water Act in large part to respond to the inefficiency of then-existing remedies for water pollution. Compliance orders, as noted above, can obtain quick remediation through voluntary compliance. The Government warns that the EPA is less likely to use the orders if they are subject to judicial review. That may be true — but it will be true for all agency actions subjected to judicial review. The APA’s presumption of judicial review is a repudiation of the principle that efficiency of regulation conquers all. And there is no reason to think that the Clean Water Act was uniquely *131 designed to enable the strong-arming of regulated parties into “voluntary compliance” without the opportunity for judicial review — even judicial review of the question whether the regulated party is within the EPA’s jurisdiction. Compliance orders will remain an effective means of securing prompt voluntary compliance in those many cases where there is no substantial basis to question their validity.
* ⅝ *
We conclude that the compliance order in this case is final agency action for which there is no adequate remedy other than APA review, and that the Clean Water Act does not preclude that review. We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

It is so ordered.

 The original statute set a penalty cap of $25,000 per violation per day. The Federal Civil Penalties Inflation Adjustment Act of 1990, 104 Stat. 890, note following 28 U. S. C. §2461, as amended by the Debt Collection Improvement Act of 1996, §3720E, 110 Stat. 1321-373, note following 28 U. S. C. § 2461, p. 1314 (Amendment), authorizes the EPA to adjust that maximum penalty for inflation. On the basis of that authority, the Agency has raised the cap to $37,500. See 74 Fed. Reg. 626, 627 (2009).

 We do not decide today that the Government’s position is correct, but assume the consequences of the order to be what the Government asserts.

 The regulation provides this consequence for “enforcement litigation that has been initiated by other Federal . . . regulatory agencies.” 33 CFR § 326.3(e)(l)(iv) (2011). The Government acknowledges, however, that the EPA’s issuance of a compliance order is considered by the Corps to fall within the provision. Brief for Respondents 31. Here again, we take the Government at its word without affirming that it represents a proper interpretation of the regulation.