# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3067
_____

Hawkes Co., Inc., et al.

*Plaintiffs - Appellants*

v.

United States Army Corps of Engineers

*Defendant - Appellee*

------------------------------

American Farm Bureau Federation; National Association of Home Builders;
National Mining Association; American Petroleum Institute; Utility Water Act
Group; Foundation for Environmental and Economic Progress

*Amici on Behalf of Appellants*
_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis
_____

Submitted: December 11, 2014
Filed: April 10, 2015
_____

Before LOKEN, BRIGHT, and KELLY, Circuit Judges.
_____

LOKEN, Circuit Judge.

Hawkes Co., Inc. (Hawkes), wishes to mine peat from wetland property owned by two affiliated companies in northwestern Minnesota. The United States Army Corps of Engineers derailed that plan when it issued an Approved Jurisdictional Determination ("JD") that the property constitutes "waters of the United States" within the meaning of the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA"), and therefore appellants must have a permit to discharge dredged or fill materials into these "navigable waters." See 33 U.S.C. §§ 1344(a), 1362(7). Appellants brought this action seeking judicial review of the JD and now appeal the district court's grant of the government's motion to dismiss their Amended Complaint. The district court concluded that an approved JD, though the consummation of the Corps' jurisdictional decisionmaking process, was not a "final agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704. While the appeal was pending, a panel of the Fifth Circuit reached the same conclusion. Belle Co., LLC v. U.S. Army Corps of Eng'rs, 761 F.3d 383 (5th Cir. 2014), cert. denied, 83 U.S.L.W. 3291 (U.S. Mar. 23, 2015) (No. 14-493).

We conclude that both courts misapplied the Supreme Court's decision in Sackett v. EPA, 132 S. Ct. 1367 (2012). Therefore, we reverse.

**I.**

The CWA requires a permit from the Corps to discharge dredged or fill materials into "navigable waters," and a permit from the Environmental Protection Agency (or an authorized state agency) to discharge any "pollutant" into navigable waters. See 33 U.S.C. §§ 1311(a), 1342, 1344. The statute defines "navigable waters" to mean "the waters of the United States," § 1362(7). This broad definition prompted the Corps and the EPA to make "sweeping assertions of jurisdiction" over every stream, ditch, and drain that can be considered a tributary of, and every wetland

that is adjacent to, traditional navigable waters.  Rapanos v. United States, 547 U.S. 715, 726-727 (2006) (plurality opinion).

In United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 139 (1985), the Supreme Court held that the Corps may require permits for the discharge of fill material into wetlands adjacent to the "waters of the United States."  But in Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers, 531 U.S. 159, 166 (2001), the Court rejected the Corps' assertion of CWA jurisdiction over "nonnavigable, isolated, intrastate waters" where migratory birds are present.  And in Rapanos, the Court concluded that the Corps' asserted jurisdiction over "wetlands based on adjacency to nonnavigable tributaries" went beyond its statutory authority. 547 U.S. at 782 (Kennedy, J., concurring in the judgment).  Because the Court's plurality and Justice Kennedy adopted different narrower tests to determine when wetlands are "waters of the United States," we held "that the Corps has jurisdiction over wetlands that satisfy either . . . test" in United States v. Bailey, 571 F.3d 791, 799 (8th Cir. 2009).

The CWA imposes heavy civil and criminal penalties on a person who discharges into navigable waters without a required permit, or in violation of an issued permit.  See 33 U.S.C. § 1319; Rapanos, 547 U.S. at 721.  When the Corps or the EPA finds that a person is violating the CWA's discharge restrictions, or a permit issued under the CWA, the agency "shall issue an order requiring such person to comply," as in Sackett, or bring a civil enforcement action, as in Riverside Bayview Homes and Rapanos.  See 33 U.S.C. §§ 1319(a)(3) (EPA) and 1344(s) (Corps).  In Sackett, the EPA issued an administrative compliance order against a person for depositing fill into jurisdictional wetlands without a permit, ordering, among other remedies, that the site be restored.  The EPA persuaded the lower courts the order was not subject to "pre-enforcement judicial review."  Applying the test for determining a final agency action in Bennett v. Spear, 520 U.S. 154, 177-78 (1997), a unanimous Court held that

the compliance order was a final agency action subject to immediate judicial review under the APA:

> [I]t is hard for the Government to defend its claim that the issuance of the compliance order was just "a step in the deliberative process" when the agency rejected the Sacketts' attempt to obtain a hearing and when the *next* step will either be taken by the Sacketts (if they comply with the order) or will involve judicial, not administrative, deliberation (if the EPA brings an enforcement action). 132 S. Ct. at 1373.

The question in this case is whether the Court's application of its flexible final agency action standard in Sackett[1] should also apply in this case, where appellants seek judicial review of an adverse JD without either completing the CWA permit process or risking substantial enforcement penalties by mining peat and discharging dredged or fill materials without a permit. That question requires a close look at the allegations in their Amended Complaint.

## II.

In reviewing the district court's Rule 12(b)(6) dismissal, we accept as true the facts alleged in the Amended Complaint. Hawkes is in the business of mining and processing peat, a "wetland dependant" activity regulated in Minnesota through permits issued by the Minnesota Department of Natural Resources. Pierce Investment Co. and LPF Properties, LLC, have property interests in a 530-acre parcel in

---

[1]The Court has consistently taken a "pragmatic" and "flexible" approach to the question of finality, and to the related question whether an agency action is ripe for judicial review. See Abbott Labs. v. Gardner, 387 U.S. 136, 148-50 (1967); accord Bell v. New Jersey, 461 U.S. 773, 779 (1983); Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n, 461 U.S. 190, 200-201 (1983).

northwestern Minnesota that contains high quality peat near Hawkes's existing peat-mining operations. All three companies are owned by members of the Pierce family.

After obtaining an option to purchase the property subject to regulatory approval, Kevin Pierce and Hawkes met with Corps and MDNR representatives to discuss Hawkes's plan to expand its operations to include the property, which would extend the life of its peat mining ten to fifteen years. In December 2010, Hawkes applied to the Corps for a CWA permit. At a January 2011 meeting, Corps representatives urged Pierce to abandon his plan, emphasizing the delays, cost, and uncertain outcome of the permitting process. Pierce responded that he had an option to purchase and intended to proceed. In March, the Corps sent a letter advising it had made a "preliminary determination" the wetland is a regulated water of the United States and, "at a minimum," an environmental assessment would be required. At an April meeting, a Corps representative told Pierce a permit would take years and the process would be very costly. During a site visit in early June, another Corps representative told a Hawkes employee that "he should start looking for another job." In August, the Corps sent Hawkes a letter advising that nine additional information items costing more than $100,000 would be needed, including hydrological and functional resource assessments and an evaluation of *upstream* potential impacts. In November, Corps representatives met with the land owner and urged that he sell the property to a "wetlands bank," advising that an environmental impact statement would likely be required, delaying the issuance of any permit for several years.

Appellants challenged the Corps' preliminary determination. In November, the Corps provided a "draft" JD concluding the property was connected by a "Relatively Permanent Water" (a series of culverts and unnamed streams) that flowed into the Middle River and then into the Red River of the North, a traditional navigable water some 120 miles away. Appellants' wetland consultant pointed out numerous errors in the analysis. Nonetheless, in February 2012 the Corps issued an Approved JD

concluding the property was a water of the United States because of its "significant nexus" to the Red River. See 33 C.F.R. §§ 320.1(a)(6), 325.9. Appellants responded by filing a timely administrative appeal. See 33 C.F.R. §§ 331.2, 331.3, 331.6.

In October 2012, the Corps' Deputy Commanding General for Civil and Emergency Operations sustained the appeal, concluding after detailed analysis that the administrative record "does not support [the District's] determination that the subject property contains jurisdictional wetlands and waters," and remanding to the District "for reconsideration in light of this decision." On December 31, 2012, the Corps nonetheless issued a Revised JD concluding, without additional information, that there is a significant nexus between the property and the Red River of the North, and advising appellants that the Revised JD was a "final Corps permit decision in accordance with 33 C.F.R. § 331.10," which meant their administrative remedies were exhausted. See 33 C.F.R. § 331.12.

Appellants then filed this action seeking judicial review of the Revised JD, alleging that it does not meet either of the applicable tests for the assertion of CWA jurisdiction established in Rapanos – the plurality's "relatively permanent" test, or Justice Kennedy's "significant nexus" test. The Corps moved to dismiss the complaint, arguing the Revised JD was not a final agency action and the issue was not ripe for judicial review. The district court dismissed the complaint for lack of final agency action. Hawkes Co., Inc. v. U.S. Army Corps of Eng'rs, 963 F. Supp. 2d 868, 871, 878 (D. Minn. 2013). This appeal followed.

### III.

The APA provides for judicial review of a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The APA "evinces Congress' intention and understanding that judicial review should be widely available

to challenge the actions of federal administrative officials." Califano v. Sanders, 430 U.S. 99, 104 (1977). When an agency action is final and, if final, appropriate for judicial review are issues that have arisen in a variety of federal agency contexts in the past one hundred years. See, e.g., Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatl., 400 U.S. 62, 70-71 (1970); Rochester Tel. Corp. v. United States, 307 U.S. 125, 132 n.11, 143-44 (1939). In Bennett, 520 U.S. at 177-78, the Court synthesized its prior precedents on the first issue:

> As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the consummation of the agency's decisionmaking process -- it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

**A.** Though the Corps argues otherwise, we agree with the district court (and every court to consider the issue) that the Revised JD clearly meets the first Bennett factor -- it was the consummation of the Corps' decisionmaking process on the threshold issue of the agency's statutory authority. See Belle Co., 761 F.3d at 389-90; Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs, 543 F.3d 586, 591-93 (9th Cir. 2008). The regulations provide that an Approved JD "constitute[s] a Corps final agency action." 33 C.F.R. § 320.1(a)(6). The Corps' Regulatory Guidance Letter No. 08-02, at 2, 5, described an Approved JD as a "definitive, official determination that there are, or that there are not, jurisdictional 'waters of the United States' on a site," and stated that an Approved JD "can be relied upon by a landowner, permit applicant, or other affected party . . . for five years" (quotation omitted). Jurisdictional determinations and permitting decisions are discrete agency actions; a party may obtain a JD without seeking a permit, and may obtain a permit without seeking an Approved JD. Fairbanks, 543 F.3d at 593. Thus, when an Approved JD has issued, "the process of administrative decisionmaking has reached a stage where judicial

review will not disrupt the orderly process of adjudication." Port of Bos., 400 U.S. at 70-71; see Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998). The possibility that the agency might informally reconsider its decision "does not suffice to make an otherwise final agency action nonfinal." Sackett, 132 S. Ct. at 1372 (quotation omitted).

**B.** The district court concluded that the Approved JD does not satisfy Bennett's second factor because it is not an agency action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" In Sackett, the EPA compliance order required petitioners to restore property they had altered without a permit and subjected them to the risk of $75,000 per day in penalties if they chose to disobey. By contrast, the district court reasoned, appellants "face no such obligations or changes in their rights as a result of their jurisdictional determination." They "may pursue a permit without a disadvantage." 963 F. Supp. 2d at 876-77.

**1.** In our view, this analysis seriously understates the impact of the regulatory action at issue by exaggerating the distinction between an agency order that compels affirmative action, and an order that prohibits a party from taking otherwise lawful action. Numerous Supreme Court precedents confirm that this is not a basis on which to determine whether "rights or obligations have been determined" or that "legal consequences will flow" from agency action.

-- In Bennett, the Court held that a Fish and Wildlife Service biological opinion satisfied the second factor because it required the Bureau of Reclamation to comply with its conditions and thereby had "direct and appreciable legal consequences." 520 U.S. at 158, 178. Though not self-executing, the biological opinion was mandatory. Likewise, here, the Revised JD requires appellants either to incur substantial compliance costs (the permitting process), forego what they assert is lawful use of their property, or risk substantial enforcement penalties.

-- In <u>Abbott Laboratories</u>, the Court held that prescription drug labeling regulations were a final agency action subject to pre-enforcement judicial review because they "purport to give an authoritative interpretation of a statutory provision" that puts drug companies in the dilemma of incurring massive compliance costs or risking criminal and civil penalties for distributing "misbranded" drugs. 387 U.S. at 152-53.

-- In <u>Frozen Food Express v. United States</u>, 351 U.S. 40 (1956), plaintiff sought judicial review of an Interstate Commerce Commission order declaring that certain agricultural commodities were not exempt from regulations requiring carriers to obtain a permit to transport. <u>Id.</u> at 41-42. As in this case, the order "would have effect only if and when a particular action was brought against a particular carrier." <u>Abbott Labs.</u>, 387 U.S. at 150. The Court nonetheless held the order reviewable because the "determination by the Commission that a commodity is not an exempt agricultural product has an immediate and practical impact"; it "warns every carrier, who does not have authority from the Commission to transport those commodities, that it does so at the risk of incurring criminal penalties." <u>Frozen Food Express</u>, 351 U.S. at 43-44. Here, the Revised JD is a determination regarding a specific property that has an even stronger coercive effect than the order deemed final in <u>Frozen Food Express</u>, which was not directed at any particular carrier. In <u>Port of Boston</u>, 400 U.S. at 70-71, the Court rejected as having "the hollow ring of another era" the contention that an "order lacked finality because it had no independent effect on anyone," citing <u>Frozen Food Express</u>.

-- In <u>Columbia Broadcasting System v. United States</u>, 316 U.S. 407 (1942), the Court held that FCC regulations barring the licensing of stations that enter into network contracts, though not self-executing, were subject to immediate review. "It is enough that, by setting the controlling standards for the Commission's action, the regulations purport to operate to alter and affect adversely appellant's contractual

rights and business relations with station owners whose application for licenses the regulations will cause to be rejected." Id. at 422. Here, the Revised JD alters and adversely affects appellants' right to use their property in conducting a lawful business activity. The adverse effect is caused by agency action, not simply by the existence of the CWA. Though the Revised JD is not-self-executing, "the APA provides for judicial review of all final agency actions, not just those that impose a self-executing sanction." Sackett, 132 S. Ct. at 1373.

**2.** The Corps argues, and the district court further concluded, that the Revised JD is not a final agency action "for which there is no other adequate [judicial] remedy," 5 U.S.C. § 704, because appellants have two other adequate ways to contest the Corps' jurisdictional determination in court -- complete the permit process and appeal if a permit is denied, or commence peat mining without a permit and challenge the agency's authority if it issues a compliance order or commences a civil enforcement action. These other CWA remedies were held not to preclude judicial review of the EPA compliance order in Sackett, 132 S. Ct. at 1372.

In this case, the contention ignores the prohibitive cost of taking either of these alternative actions to obtain judicial review of the Corps' assertion of CWA jurisdiction over the property. First, as a practical matter, the permitting option is prohibitively expensive and futile. The Supreme Court reported in Rapanos, 547 U.S. at 721, that the average applicant for an individual Corps permit "spends 788 days and $271,596 in completing the process." Moreover, the Amended Complaint alleged that the Corps' District representatives repeatedly made it clear to Kevin Pierce, to a Hawkes employee, and to the landowner that a permit to mine peat *would ultimately be refused.* In our view, this alone demonstrates that the second Bennett factor is satisfied. Moreover, even if appellants eventually complete the permit process, seek judicial review of the permit denial, and prevail, they can never recover the time and

money lost in seeking a permit they were not legally obligated to obtain. Cf. Iowa League of Cities v. EPA, 711 F.3d 844, 868 (8th Cir. 2013).

Second, appellants' other option -- commencing to mine peat without a permit and await an enforcement action -- is even more plainly an inadequate remedy. Appellants "cannot initiate that process, and each day they wait for the agency to drop the hammer, they accrue" huge additional potential liability. Sackett, 132 S. Ct. at 1372. Because appellants were forthright in undertaking to obtain a permit, choosing now to ignore the Revised JD and commence peat mining without the permit it requires would expose them to substantial criminal monetary penalties and even imprisonment for a knowing CWA violation. Thus, like the compliance order at issue in Sackett, the Revised JD increases the penalties appellants would risk if they chose to begin mining without a permit. See 33 U.S.C. § 1319(c).

The prohibitive costs, risk, and delay of these alternatives to immediate judicial review evidence a transparently obvious litigation strategy: by leaving appellants with no immediate judicial review and no adequate alternative remedy, the Corps will achieve the result its local officers desire, abandonment of the peat mining project, without having to test whether its expansive assertion of jurisdiction -- rejected by one of their own commanding officers on administrative appeal -- is consistent with the Supreme Court's limiting decision in Rapanos. For decades, the Corps has "deliberately left vague" the "definitions used to make jurisdictional determinations," leaving its District offices free to treat as waters of the United States "adjacent wetlands" that "are connected to the navigable water by flooding, on average, once every 100 years," or are simply "within 200 feet of a tributary." Rapanos, 547 U.S. at 727-28, quoting a GAO report. The Court's decision in Sackett reflected concern that failing to permit immediate judicial review of assertions of CWA jurisdiction would leave regulated parties unable, as a practical matter, to challenge those assertions. The Court concluded that was contrary to the APA's presumption of

-11-

judicial review. "[T]here is no reason to think that the Clean Water Act was uniquely designed to enable the strong-arming of regulated parties into 'voluntary compliance' without the opportunity for judicial review -- even judicial review of the question whether the regulated party is within the EPA's jurisdiction." 132 S. Ct. at 1374.

In our view, a properly pragmatic analysis of ripeness and final agency action principles compels the conclusion that an Approved JD is subject to immediate judicial review. The Corps's assertion that the Revised JD is merely advisory and has no more effect than an environmental consultant's opinion ignores reality. "[I]n reality it has a powerful coercive effect." Bennett, 520 U.S. at 169. Absent immediate judicial review, the impracticality of otherwise obtaining review, combined with "the uncertain reach of the Clean Water Act and the draconian penalties imposed for the sort of violations alleged in this case . . . leaves most property owners with little practical alternative but to dance to the EPA's [or to the Corps'] tune." "In a nation that values due process, not to mention private property, such treatment is unthinkable." Sackett, 132 S. Ct. at 1375 (Alito, J., concurring). We conclude that an Approved JD is a final agency action and the issue is ripe for judicial review under the APA.[2]

The judgment of the district court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

---

[2]The question of ripeness "turns on 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" Pac. Gas & Elec. Co., 461 U.S. at 201, quoting Abbott Labs., 387 U.S. at 149. The issues of ripeness and final agency action are distinct, but in this case, our analysis of the final agency action factors in Bennett resolves the ripeness issue as well.

KELLY, Circuit Judge, concurring.

I view whether a JD is reviewable under the APA as a close question. In Sackett, the Supreme Court concluded that a compliance order issued by the EPA "severely limits [petitioners'] ability to obtain a permit for their fill from the Army Corps of Engineers [because] [t]he Corps' regulations provide that, once the EPA has issued a compliance order with respect to certain property, the Corps will not process a permit application for that property unless doing so 'is clearly appropriate.'" Sackett v. EPA, 132 S. Ct. 1367, 1372 (2012) (internal citation omitted) (quoting 33 C.F.R. § 326.3(e)(1)(iv)).[3] The record in the present case does not reveal that a similar impediment to receiving a permit exists once a JD has been issued. In Sackett, the Corps had a published policy regarding the decreased likelihood of receiving a permit; here, the record includes case-specific facts, such as informal comments made by Corps representatives, suggesting that a permit application made by Hawkes might be "futile." See Majority Opinion, supra, slip op. at 10. However, I question how much weight should be given to the futility of the permit application for an individual applicant, or the time and cost spent applying, in determining whether or not the JD constitutes a final agency action. If a JD is a final agency action, an applicant who is *likely* to obtain a permit would still be in a position to seek judicial review of the JD. Similarly, it must be the case that were the Corps to take steps to make the permit process both more efficient and less costly, the reviewability of the JD would not change.

_____

[3] "No permit application will be accepted nor will the processing of an application be continued when the district engineer is aware of enforcement litigation that has been initiated by other Federal, state, or local regulatory agencies, unless he determines that concurrent processing of an after-the-fact permit application is clearly appropriate." 33 C.F.R. § 326.3(e)(1)(iv)

I also note other differences between the compliance order in <u>Sackett</u> and the JD in the present case. A compliance order, once issued, begins the accumulation of penalties (potentially doubled) for each day the landowner remains in violation. <u>Id.</u> A JD, however, has no such penalty scheme. Indeed, 33 U.S.C. § 1319(d), the CWA's enforcement section on civil penalties, makes no mention of JDs. While the existence of a JD may affect a court's assessment of a party's "good faith" while determining civil penalties, I agree with the other courts that have considered this issue that any penalties resulting from a JD are far more "speculative" than those threatened in <u>Sackett</u>. <u>Belle Co., LLC v. U.S. Army Corps of Eng'rs</u>, 761 F.3d 383, 392 (5th Cir. 2014); <u>see also</u>, <u>Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs</u>, 543 F.3d 586, 595 (9th Cir. 2008). The Appellants fail to point to a single case in which increased civil penalties were levied against a party for ignoring a JD.

Despite these dissimilarities with the circumstances in <u>Sackett</u>, I agree that Hawkes is left without acceptable options to challenge the JD, absent judicial review. Hawkes's choice is to either (1) follow through on their peat-mining plans until either the EPA issues a compliance order or the Corps commences an enforcement action, to both of which Hawkes could raise lack of CWA jurisdiction as a defense; or (2) apply for a permit (on the grounds that no permit is required) and, if the application is denied, appeal the denial in court. But what happens if Hawkes is, after all, granted a permit yet maintains it never needed one in the first place? It must decline the permit and challenge the original jurisdiction in court. This roundabout process does not seem to be an "adequate remedy" to the alternative of simply allowing Hawkes to bring the jurisdictional challenge in the first instance and to have an opportunity to show the CWA does not apply to its land at all.

In my view, the Court in <u>Sackett</u> was concerned with just how difficult and confusing it can be for a landowner to predict whether or not his or her land falls within CWA jurisdiction—a threshold determination that puts the administrative

process in motion. This is a unique aspect of the CWA; most laws do not require the hiring of expert consultants to determine if they even apply to you or your property. This jurisdictional determination was precisely what the Court deemed reviewable in Sackett. See Sackett, 132 S. Ct. at 1374–75 (Ginsburg, J., concurring). Accordingly, I concur in the judgment of the court.

_____