# United States Court of Appeals

### For the Eighth Circuit

_____

No. 24-2547
_____

Union Pacific Railroad Company

*Plaintiff - Appellant*

v.

U.S. Railroad Retirement Board

*Defendant - Appellee*
_____

Appeal from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: February 12, 2025
Filed: December 16, 2025
_____

Before LOKEN, BENTON, and STRAS, Circuit Judges.
_____

LOKEN, Circuit Judge.

The Railroad Retirement Act of 1974 ("RRA") provides long-term retirement, disability, and survivor benefits to covered railroad employees and, in some cases, their spouses and survivors, funded by a payroll tax on the railroads and their employees. 45 U.S.C. § 231a(a)-(d); see BNSF Ry. Co. v. Loos, 586 U.S. 310, 313-14 (2019). The Railroad Unemployment Insurance Act ("RUIA") provides benefits for short-term periods of unemployment and sickness, funded by employer

contributions. 45 U.S.C. § 358(a)(1)(A)(i). The U.S. Railroad Retirement Board (the "Board"), an independent executive branch agency, administers benefits under both statutes. See Salinas v. U.S. R.R. Ret. Bd., 592 U.S. 188, 190 (2021). Pursuant to its statutory authority to determine claims for benefits and make awards, see 45 U.S.C. §§ 231f(b), 355(b)-(c), 362(*l*), the Board initiates investigative hearings and makes initial determinations whether a person or entity is a covered employer or employee. These proceedings are governed by its longstanding regulations. See 20 C.F.R. Parts 258 and 259. This authority includes the power to subpoena witnesses and require testimony and to require production of evidence to aid the Board's investigations. 45 U.S.C. §§ 231f(b), 362(a).

The Union Pacific Railroad Company ("UP") is a covered railroad carrier headquartered in Omaha, Nebraska. Its operations include "flagging," a rail industry term for providing protection for those working on or close to railroad tracks from the hazard of being struck by a train or other on-track equipment. RailPros Field Services, Inc. ("RailPros") is an independent company that employs or contracts with workers who perform "flagging" services for third parties that require access to UP's right of way for projects that do not concern UP's own work or operations.

The Brotherhood of Maintenance of Way Employes Division of the International Brotherhood of Teamsters ("BMWED") is a union that represents some UP employees but does not represent RailPros workers. In November 2017, the BMWED submitted a request to the Board for a determination whether RailPros flagging workers are covered under the RRA and the RUIA. The BMWED alleged that UP and RailPros were replacing union-represented employees with RailPros contract workers to perform flagging services for third parties having access to UP facilities, which "created a business model . . . that essentially uses the payment of age and service annuities under the [RRA] to subsidize the use of workers to displace employees who otherwise would be paying into the Railroad Retirement system." After an investigation by the Board's Office of General Counsel, in December 2021

the Board requested UP's responses to a set of questions regarding RailPros' flagging services. UP provided responses and cooperated with additional information requests.

On April 14, 2023, the Board entered an Order (the "April 2023 Order") initiating a hearing to determine whether RailPros contract workers performing flagging services are covered employees and designating the BMWED as a party entitled to participate in the hearing (in addition to UP and RailPros). UP objected to the Board's designation of the BMWED as a party because the union would gain access to confidential business information that UP places in an administrative record that is accessible to the public. The Board's hearing examiner responded that the BMWED was designated as a party "to gather relevant evidence as permitted by statute." Because the union made the initial inquiry regarding the employee status of RailPros workers performing flagging services, the hearing examiner explained, the "inclusion of the BMWED as a party . . . is intended to obtain additional information about those flagging services." The hearing examiner agreed to consider UP's proposed protective order preventing the BMWED from accessing the railroad's confidential business information and offered an alternative protective order and non-disclosure agreement ("NDA"). UP refused to sign the NDA, stating it would not accept an outcome entitling the BMWED to participate as a party.

Having reached an impasse with the Board, UP brought this action seeking judicial review of the April 2023 Order granting the BMWED party status. The Amended Complaint alleges that the details of UP's business arrangements with RailPros and with third parties who access UP's right of way to perform their own work, and how RailPros workers performing flagging services are utilized by third parties performing their own work on UP property, are "maintained as private and confidential in the normal course of its business operations." The BMWED "has taken adversarial positions regarding contracted flagging services with UP and other railroads . . . over the last decade," the Amended Complaint alleges, and "has filed

-3-

over 1,500 grievances on this topic" requiring UP to respond "at considerable expense." Giving the BMWED party status to the hearing "guarantee[s] that the BMWED -- which has an adversarial relationship to UP -- will gain access to UP's confidential business information through the Board Hearing and related proceedings." Nothing in the Board's governing statutes grants it authority to give party status to the BMWED in this context. The April 23 Order is a final agency action for purposes of judicial review under the APA, 5 U.S.C. § 704, and the Order to grant the BMWED party status, "or otherwise gain access to UP confidential business information," is unlawful, arbitrary and capricious and an abuse of discretion under the APA. See 5 U.S.C. § 706(2)(A).

Without deciding whether the April 23 Order is a final action under the APA, the district court dismissed the complaint for lack of subject matter jurisdiction. Applying the three Thunder Basin factors, the court concluded that it lacked jurisdiction because the statutory judicial review provisions in the RRA and the RUIA extend to the April 2023 Order and provide for exclusive judicial review in an appropriate court of appeals. See Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 212-13 (1994). This appeal followed. "We review de novo the grant of a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1)." Hastings v. Wilson, 516 F.3d 1055, 1058 (8th Cir. 2008) (quotation omitted).

## I. Judicial Review of Board Decisions

Chapter 7 of the APA makes judicial review available for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. "[U]nless Congress expressly says otherwise, APA review takes place first in the federal district courts, not the courts of appeals." Rodriguez v. Penrod, 857 F.3d 902, 906 (D.C. Cir. 2017). "District courts may ordinarily hear those challenges by way of 28 U.S.C. § 1331's grant of jurisdiction for claims 'arising under' federal law." Axon Enter., Inc. v. FTC, 598 U.S. 175, 185 (2023). "The APA 'evinces Congress' intention and

understanding that judicial review should be widely available to challenge the actions of federal administrative officials.'" Hawkes Co. v. U.S. Army Corps of Eng'rs, 782 F.3d 994, 999 (8th Cir. 2015) (quotation omitted).

That is the normal default rule. Congress may substitute an alternative review procedure -- what is commonly called a special statutory review scheme -- such as exclusive review in one or more designated courts of appeals. In both the RUIA and the RRA, Congress created a special statutory review scheme: judicial review of final Board decisions in the courts of appeals rather than in the district courts. But does that special statutory review scheme apply to the Board's April 23 Order?

In Thunder Basin, a surface coal mining company filed a suit in district court seeking pre-enforcement injunctive relief against the Secretary of Labor's authority to compel immediate compliance with Mine Safety Act provisions in a proceeding that included the threat of mandatory civil penalties. 510 U.S. at 202-06. The Court held that prior cases have upheld allocating initial review to an administrative agency and delaying judicial review until final agency action "where such intent is fairly discernable in the statutory scheme." Id. at 207. In Axon, a case that involved challenges to SEC and FTC agency enforcement proceedings, the Court noted a caveat that is the core issue on this appeal:

> But a statutory review scheme of that kind does not necessarily extend to every claim concerning agency action. Our decision in *Thunder Basin* makes that point clear. After finding that Congress's creation of a "comprehensive review process" like the ones here ousted district courts of jurisdiction, the Court asked another question: whether the particular claims brought were "of the type Congress intended to be reviewed within this statutory structure." The Court identified three considerations designed to aid in that inquiry, commonly known now as the Thunder Basin factors. First, could precluding district court jurisdiction "foreclose all meaningful judicial review" of the claim? Next, is the claim "wholly collateral to [the] statute's review

provisions"? And last, is the claim "outside the agency's expertise"? When the answer to all three questions is yes, we presume that Congress does not intend to limit jurisdiction [to the courts of appeals]. But the same conclusion might follow if the factors point in different directions. The ultimate question is how best to understand what Congress has done -- whether the statutory review scheme, though exclusive where it applies, reaches the claim in question.

Axon, 598 U.S. at 185-86 (internal citations omitted).

UP argues on appeal, as it did in district court, that the April 2023 Order entered prior to the Board's investigative hearing is not a "final decision" of the Board *on a claim for benefits* that must be reviewed in an appropriate court of appeals. Rather, it is an interim agency order that is a "final agency action for which there is no other adequate remedy in a court" that can be reviewed by an appropriate district court under § 704 of the APA. That is the important determination mandated by Axon -- even if this interim agency order is a final agency action *for purposes of APA review*, is it also "of the type Congress intended to be reviewed" within the RRA and the RUIA special statutory review scheme mandating review in the court of appeals? In our view, while Axon confirmed that the Thunder Basin factors are an important aid in determining congressional intent, the threshold question is whether the agency order at issue falls within the relevant statutory review scheme. This is a serious issue of first impression in this Court, and there is little if any persuasive authority elsewhere. It was ignored by the district court, which just held that the Thunder Basin factors are all that matters.

The Board argues there is no relevant distinction in applying Thunder Basin to pre-enforcement challenges to agency enforcement actions and to challenges to interim agency orders unrelated to enforcement. It distinguishes Axon as simply holding "that certain constitutional claims . . . did not fall within the relevant review schemes which otherwise channeled claims to the courts of appeals." But that

argument fails to acknowledge the holding in Axon that "a statutory review scheme of [the kind here at issue] does not necessarily extend to every claim concerning agency action." We give agency arguments that rewrite Supreme Court interpretations of statutes or the Court's prior decisions little if any weight or credibility. See MikLin Enters., Inc. v. NLRB, 861 F.3d 812, 823 (8th Cir. 2017) (en banc) (agency interpretation of Supreme Court precedent "is not entitled to judicial deference"); cf. Loper Bright Ents. v. Raimondo, 603 U.S. 369, 388 (2024) (discussing Skidmore v. Swift & Co., 323 U.S. 134, 139-40 (1944)).

To determine the scope of the RRA and the RUIA special statutory review provisions, we look to the text of both statutes, taking into account "both the specific context in which language is used and the broader context of the statute as a whole." Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 321 (2014) (cleaned up).

The RUIA provides that "[a]ny claimant . . . or any other party aggrieved by a final decision . . . may . . . after all administrative remedies within the Board [are] exhausted, obtain a review of any final decision of the Board by filing a petition for review" in the Seventh Circuit, the D.C. Circuit, or "the United States court of appeals for the circuit in which the claimant or other party resides." 45 U.S.C. § 355(f).

The RRA judicial review provision, 45 U.S.C. § 231g, "makes judicial review available . . . to the same extent that review is available under the RUIA." Salinas, 592 U.S. at 190 (citations omitted). Section 355(f) channels "review of any final decision of the Board." The cross-referenced subsection, § 355(c), describes the process for hearing and review of claims and refers repeatedly to "claim[s] for benefits." Section 355(b) authorizes and directs the Board to make decisions "as to the right of any claimant to benefits" and to hold hearings, conduct investigations and other proceedings, and to establish procedures "for the determination of a right to benefits." This focus on substantive benefits determinations is reiterated in the

judicial review provision, which concludes by providing when "[a]n applicant for review of a final decision of the Board concerning a claim for benefits" is liable for costs. § 355(f).

Nevertheless, as the Board points out, the Supreme Court explained in Salinas that Congress' use of broad language allowing parties to "obtain a review of any final decision of the Board" in § 355(f) indicates that "§ 355(f) encompasses decisions beyond those described in § 355(c)." 592 U.S. at 198. The Court pointed to § 355(g), which lists three types of Board decisions that are exclusively reviewable under § 355(f): findings of fact and legal conclusions on determinations of claims for benefits or refunds, determinations of "any other matter" pursuant to § 355(c), and determinations that certain unexpended funds may be used to pay benefits or refunds. Salinas, 592 U.S. at 198. But those determinations are directly linked to a claim for benefits already made. Thus, the context of the special statutory review scheme reflects a focus on the Board's ultimate benefits decisions. The RRA's special statutory review provision, 45 U.S.C. § 231g, "makes judicial review available under the RRA to the same extent that review is available under the RUIA," and therefore reflects a similar focus on the review of substantive benefits decisions. Its reference to "decisions" determining "rights or liabilities" is plainly a reference to benefits the Board is tasked with administering.

In Salinas, the Court rejected the Board's contention that its refusal to reopen a prior denial of benefits *is not subject to judicial review at all*, which is not an issue in this case. The Court noted that "any final decision" in § 355(f) "denotes some kind of terminal event," such as the term "final state of review" and similar language in the APA. The ruling at issue in Salinas, the Board's refusal to reopen a prior benefits decision, was "the terminal event" in its benefits review process. Therefore, the Board's refusal to reopen was subject to judicial review in the court of appeals under § 355(f). 592 U.S. at 194.

By contrast, here the issue is whether a party who will not be responsible for any benefits contributions and does not represent the allegedly covered workers at issue may be a fully participating party in a preliminary proceeding that is wholly collateral to a future benefits determination. A preliminary determination of who will participate in a Board hearing is not the kind of terminal event that marks the end of the Board's decision-making process on a claim for benefits.

For these reasons, we conclude that the text of the RRA and the RUIA special statutory review provisions, read in context, does not answer the question <u>Axon</u> requires us to decide -- whether the particular claims at issue here were "of the type Congress intended to be reviewed within this statutory structure." So we must look elsewhere. Again, as in <u>Axon</u>, "[t]he ultimate question is how best to understand what Congress has done." 598 U.S. at 186. Though we disagree with the district court's conclusion that the three <u>Thunder Basin</u> factors are all that matters, we agree they are highly relevant considerations, as they were in <u>Axon</u>.

The first factor is whether delaying review of the April 23 Order until the Board decides the merits of the flagging workers' coverage will result in the "foreclosure of meaningful judicial review." The district court said no because UP may exhaust administrative remedies and obtain judicial review of the April Order by a court of appeals after a final agency decision, which "would not come too late to be meaningful." This ignores a key aspect of UP's claim. UP argues irreparable injury to its business interests if the BMWED has unrestricted access to confidential information UP places in a hearing record that is accessible to interested members of the public, and the Board refused to limit the BMWED's access or sufficiently restrict its use of the information. That is clearly a cognizable APA claim in a district court action to review an agency order if it is a final agency action under the APA even if it is an interim agency order. If the Board "lets the cat out of the bag," meaningful judicial review is foreclosed. This factor supports UP's position.

-9-

The second factor is whether UP's claim is "wholly collateral" to the special statutory review provisions. The district court said no because UP does not object to the Board's power generally, only to the way the power is being "wielded," and the claim "concerns BMWED's participation in an inquiry that [the Board] is clearly authorized to make into the potential 'coverage' of Railpros workers." But that has nothing to do with the relevant inquiry under Axon -- whether the union's participation as a party in an initial hearing that some day may end in a coverage decision is collateral to the ultimate benefits decisions that the special statutory review scheme controls. UP does not object to the BMWED participating as a witness, and the Board has ample authority to gather relevant evidence by means other than granting the BMWED unlimited access to confidential information the Board requires UP to place in the hearing record with little if any limitation on the BMWED's competitive use of that information. This factor supports UP's position.

The third factor is whether UP's claim is "outside the agency's expertise." The district court said no because the Board "knows a great deal about the policy of railroad worker benefits coverage, and UP's claim does not involve policies more properly within the knowledge of the courts." On appeal, the Board argues that UP's "claim is directed at matters where the Board is an expert -- determining which entities should be considered parties to a hearing under the Board's regulations." Whether the Board has manipulated its process to provide an unfair competitive advantage to BMWED, an adverse partisan in this labor relations context, is an issue on which the Board has no established expertise and may be a biased decision maker. This is an APA claim that has nothing to do with the purpose of the special statutory review provisions at issue. If the April 23 Order was a final agency action under the APA, its immediate review belongs in the district court.

## II. The APA Final Agency Action Issue.

UP's Amended Complaint alleges that the Board's April 2023 Order will injure UP by causing disclosure of confidential business information to the BMWED, an adverse party in their labor dealings; that the April 23 Order is subject to judicial review in the district court under the APA, 5 U.S.C. § 704; and that the Order granting the BMWED party status is agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" that the reviewing court "shall . . . hold unlawful and set aside."  5 U.S.C. § 706(2)(A).  When there is no other basis for immediate judicial review of an interlocutory agency order, as here, jurisdiction is limited to the APA, which provides for review of a "final agency action for which there is no other adequate remedy in a court."  Sierra Club v. U.S. Army Corps of Eng'rs, 446 F.3d 808, 813 (8th Cir. 2006).

It is well established that the party seeking APA review must satisfy two conditions for the challenged agency action to be considered "final."  First, the action must mark the consummation of the agency's decision-making process and not be merely tentative or interlocutory in nature.  "Second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (cleaned up).  To satisfy this second condition, the agency action "must inflict some legal injury upon the party seeking judicial review," either compelling affirmative action or prohibiting otherwise lawful action.  Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. U.S. Corps of Eng'rs, 888 F.3d 906, 915 (8th Cir. 2018).

In Hawkes, we held that the U.S. Army Corps of Engineers' "jurisdictional determination" that certain wetland property was subject to permitting requirements under the Clean Water Act was a final agency action under the APA, despite the fact that this determination was preliminary to the final permitting decision.  782 F.3d at 996-97.  The Supreme Court affirmed, concluding that this determination made after

-11-

extensive factfinding satisfied both <u>Bennett</u> conditions.  <u>Hawkes</u>, 578 U.S. at 598 (quotation omitted).  When an agency "has issued a definitive statement of its position, determining the rights and obligations of the parties, that action is final for purposes of judicial review despite the possibility of further proceedings in the agency to resolve subsidiary issues."  <u>Sierra Club</u>, 446 F.3d at 813.

Here, we conclude both <u>Bennett</u> conditions are satisfied.  First, the April 2023 Order marks the consummation of the Board's decision-making process on the threshold issue of who will participate as parties in the hearing to determine whether workers who perform railroad flagging services on UP's property and are employees or independent contractors of RailPros, which is not a covered employer, are nonetheless employees covered by the RRA and the RUIA.  Party status means the BMWED has the right to participate fully, including the rights to examine and cross-examine witnesses and fully access the record, including UP's confidential business information.  The Board conceded finality for purposes of its motion to dismiss.

If immediate judicial review is not available, UP will be in a situation like the mining company appellant in <u>Hawkes</u> -- participate in the hearing process and place its confidential business information in the record, giving the BMWED unrestricted access UP claims is improper, or take a "violate-and-defend" approach by refusing to submit confidential information requested by the Board and then challenging the inclusion of the BMWED as a party after the Board has made a final coverage ruling. "Absent immediate judicial review," we concluded in <u>Hawkes</u>, "such treatment is unthinkable" given "the impracticality of otherwise obtaining review [and] the draconian penalties imposed."  782 F.3d at 1002 (cleaned up), quoting <u>Sackett v. EPA</u>, 566 U.S. 120, 132 (Alito, J., concurring).

Second, the April 2023 Order determined legal rights and obligations.  The Supreme Court "has consistently taken a 'pragmatic' and 'flexible' approach to the question of finality."  <u>Hawkes</u>, 782 F.3d at 997 n.1, quoting <u>Abbott Labs v. Gardner</u>,

-12-

387 U.S. 136, 149-50 (1967). "Bennett prong-two determinations [are] based on the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it." Cal. Cmtys. Against Toxics v. EPA, 934 F.3d 627, 637 (D.C. Cir. 2019). The BMWED's designation as a party means it will have unrestricted access to confidential business information that UP is required to place in the record, when UP and the BMWED have extensive legal adversity on the same subject matter -- flagging services performed by RailPros workers for third parties with access to UP property.

We have found agency decisions non-final when they had no such consequences for the party seeking immediate judicial review. For example, in Sisseton-Wahpeton, the Army Corps of Engineers responded to a complaint that a construction permit be removed with a letter stating that its prior permitting and exemption decisions were valid and the owner's use of the land continued to be for permissible agricultural purposes. 888 F.3d at 909-12. We held that the letter was not a final agency action because it neither affected legal rights nor inflicted new injury on the complainant. Rather, the Corps "merely stated how it had applied the law at the time it issued the permit and exemption determinations." Id. at 915.

The Board argues that decisions allowing parties to participate in an administrative proceeding, like the April 2023 Order, do not amount to final agency action, relying on FTC v. Standard Oil Co. of California, 449 U.S. 232, 242 (1980) (a party's "burden of responding to the charges made against it . . . is different in kind and legal effect from the burdens attending what heretofore has been considered to be final agency action"), and Arch Coal, Inc. v. Acosta, 888 F.3d 493, 503 (D.C. Cir. 2018) ("It is firmly established that agency action is not final merely because it has the effect of requiring a party to participate in an agency proceeding.") (quotation omitted). However, unlike the parties seeking immediate judicial review in those cases, UP is not challenging its own required participation in the coverage determination hearing, nor does it contest the Board's authority to conduct the

-13-

hearing and make an ultimate determination. Instead, separate from the merits of that decision, UP contests only the unrestricted participation of a third party, the BMWED, that is not a covered party.

This is not, as the Board argues, "an impermissible attempt to make an 'end run' around the statutory scheme . . . [that] would allow the plaintiff to short-circuit the administrative review process and the development of a detailed factual record by the agency." Great Plains Coop v. CFTC, 205 F.3d 353, 355 (8th Cir. 2000). UP seeks immediate judicial review of an interlocutory agency order that is the culmination of the agency's decision-making process on an issue that determined legal rights and obligations with adverse concrete consequences on UP, the party seeking immediate judicial review. Applying Hawkes, Bennett v. Spear, and Sackett, we conclude the April 2023 Order is a final agency action under the APA. As the Order is not immediately reviewable in a court of appeals under the special judicial review provisions of the RRA or the RUIA, it is a "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, that is subject to immediate judicial review by an APA action filed in the district court.

The judgment of the district court dismissing this case for lack of subject matter jurisdiction is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

_____