# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 24, 2014          Decided May 15, 2015

No. 13-5290

NATIONAL ASSOCIATION OF HOME BUILDERS, ET AL.,
APPELLANTS

v.

ENVIRONMENTAL PROTECTION AGENCY, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00078)

———

*Norman D. James* argued the cause for appellants. With him on the briefs was *Aaron T. Martin. Felicia K. Watson* entered an appearance.

*Katherine J. Barton*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Robert G. Dreher*, Acting Assistant Attorney General, and *Andrew J. Doyle* and *Robert J. Lundman*, Attorneys.

Before: PILLARD, *Circuit Judge*, and SILBERMAN and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Concurring opinion filed by *Senior Circuit Judge* SILBERMAN, joined by *Senior Circuit Judge* SENTELLE.

PILLARD, *Circuit Judge*: We addressed the basic controversy in this case in *Nat'l Ass'n of Home Builders v. EPA* ("*Home Builders I*"), 667 F.3d 6 (D.C. Cir. 2011), which dismissed a similar suit involving the same parties for want of constitutional standing. In both that case and this one, trade-group plaintiffs (collectively, Home Builders) challenged a preliminary, internal determination, made by the Environmental Protection Agency and the United States Army Corps of Engineers in 2008, that two stretches of the Santa Cruz River in southern Arizona are traditional navigable waters. The Clean Water Act regulates "waters of the United States." 33 U.S.C. § 1362(7); *see Rapanos v. United States*, 547 U.S. 715, 722-23 (2006) (plurality); *id*. at 760-61 (Kennedy, J., concurring). Some of Home Builders' members own property within the Santa Cruz River watershed that they wish to develop. They contend that the agencies' 2008 navigability determination has cognizably harmed them by making it more likely that they will need Clean Water Act permits to discharge on their land. They assert that the Corps' memorandum and the EPA's letter concluding that the relevant stretches of the Santa Cruz River are traditional navigable waters announced a final, binding, legislative rule unlawfully promulgated without public notice and comment, thus depriving them of any opportunity to contest it. We hold that Home Builders' case for standing, although since supplemented with new declarations from members adding factual detail to their assertions of injury, is materially unchanged and thus precluded by *Home Builders I*.

## I.

The Clean Water Act requires a permit for any discharge of pollutants into the "waters of the United States." 33 U.S.C. §§ 1319, 1342, 1344, 1362(7). The Army Corps of Engineers is responsible for permitting discharges of "dredged or fill material," *id.* § 1344, and the EPA (or a coordinate state agency) does the permitting for discharges of wastewater or other pollutants, *id.* § 1342. In either case, the agency notifies the public and provides a hearing before ruling on a permit application. *Id.* §§ 1342(a)(1), 1344(a); 33 C.F.R. § 325.3.

Precisely which watery—or even intermittently wet—landscape features count as the "waters of the United States" for purposes of Clean Water Act jurisdiction is not always immediately obvious. The variability of natural geography, and the myriad ways that water runs, washes, trickles, seeps, or gushes, complicate the task of giving specificity to "waters of the United States" under the Act. Landowners like Home Builders' members may often be uncertain whether to undertake the cost and inconvenience of seeking a Clean Water Act permit or whether, conversely, they might safely dredge, fill, and discharge without one. A bright-line rule certainly would make things clearer for landowners like Home Builders, but the Act contains no such rule.

The Supreme Court's most recent guidance on the matter comes from the fractured decision in *Rapanos*, 547 U.S. 715, where the Court considered whether wetlands adjacent to tributaries of traditional navigable waters are subject to Clean Water Act jurisdiction. Justice Scalia wrote for four members of the Court supporting reversal and remand for further consideration of the Corps' asserted jurisdiction. That plurality concluded that "waters of the United States," while not limited to waters that are navigable in the traditional

sense, *see id.* at 730-31, is confined to "only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams, oceans, rivers, and lakes,'" *id.* at 739 (internal alteration marks omitted). Providing a fifth vote to reverse and remand, Justice Kennedy rejected as unduly narrow the plurality's reading of the Act's text, structure and purpose—a reading he thought makes "little practical sense in a statute concerned with downstream water quality." *Id.* at 769. The Act also applies to wetlands, he concluded, insofar as they have a "significant nexus" with traditional navigable waters. *Id.* at 779-82. Four dissenting Justices would have deferred to the Corps' assertion of its jurisdiction under what they viewed as its longstanding, reasonable interpretation of the Act as applicable to traditional navigable waters, their tributaries, and wetlands adjacent to either. *Id.* at 792-93 (Stevens, J., dissenting).

To help agency personnel and the regulated community understand the impact of *Rapanos* on implementation of the Clean Water Act, the agencies in 2007 issued interpretive guidance. The 2007 *Rapanos* Guidance concluded that the Act extended only to traditional navigable waters (waters that are navigable in fact), and non-navigable waters that have a "significant nexus" with traditional navigable waters—a narrowing of the agencies' prior interpretation. *See Home Builders I*, 667 F.3d at 10 & n.7, 13 n.8 (citing the agencies' 2007 *Rapanos* Guidance).

Landowners and developers who want to confirm how such general standards apply to their particular circumstances may, in advance of seeking a permit, solicit a written, site-specific Jurisdictional Determination (JD) from the Corps. A JD reflects the agency's judgment about whether and to what extent a property contains jurisdictional waters, and hence is

or is not subject to regulatory jurisdiction under the Clean Water Act.[1]  *See* 33 C.F.R. §§ 320.1(a)(6), 331.2, 325.9.  Both EPA and the Corps use JDs in their respective spheres of administration of the Act.

JDs may be issued as either "preliminary" or "approved." A preliminary JD is an advisory determination, not administratively appealable, that indicates that "there *may be* waters of the United States on a parcel," and identifies aquatic features on the property that could be affected by the proposed activity.  33 C.F.R. § 331.2 (emphasis added). Preliminary JDs are usually issued at the request of landowners wishing "to voluntarily waive or set aside questions regarding CWA[] jurisdiction" over their property, such as where jurisdiction is clear or is otherwise not worth contesting.  U.S. Army Corps of Eng'rs, No. 08-02, Guidance Letter:  Jurisdictional Determinations (June 26, 2008) (Appellant Br. Add. 17-23) (hereinafter "JD Guidance"), at 3; *see also id.* at 6 (preliminary JDs render an "effective presumption" of CWA  jurisdiction).  As part of a shortcut into the permitting process, a preliminary JD does not make an official designation of jurisdictional waters.  *See id.* at 3, 6; Corps Preliminary JD Form, Appellant Br. Add. 24-26; App. at 311.  Rather, an applicant willing to accept a preliminary JD may move directly to permitting.

An approved JD, in contrast, is a considered statement of the agency's view of "the presence or absence of waters of the United States on a parcel."   33 C.F.R. § 331.2; *see* JD

---

[1] *See also Home Builders I*, 667 F.3d at 10, 13-14 & n.8; *Hawkes Co. v. U.S. Army Corps of Eng'rs*, No. 13-3067, 2015 WL 1600465, at \*3 (8th Cir. Apr. 10, 2015); *Belle Co. LLC v. U.S. Army Corps of Eng'rs*, 761 F.3d 383, 386-87, 390-91 (5th Cir. 2014); *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 589-90, 592-93 (9th Cir. 2008).

Guidance at 1. An approved JD thus announces the agency's official determination whether or not the parcel contains either traditional navigable waters, or features such as washes, tributaries or wetlands with a significant nexus to traditional navigable waters, meaning that the Clean Water Act applies. *See* Corps Approved JD Form, Appellant. Br. Add. 28-34. The regulations characterize an approved JD as final agency action. 33 C.F.R. § 320.1(a)(2), (6). As noted above, a party can get a discharge permit with a preliminary JD. However, if a party ever wants to pursue an administrative appeal challenging Clean Water Act jurisdiction, an approved JD must be in place. *See* JD Guidance at 2-5; *see* 33 C.F.R. §§ 331.2-331.7. Thus, a party that believes that the agencies have erroneously asserted Clean Water Act jurisdiction and wishes to contest it must first obtain (or earlier have obtained) an approved JD.

After the Supreme Court decided *Rapanos* and the agencies issued their *Rapanos* Guidance, EPA and the Corps made the traditional navigable waters determination ("TNW Determination") that Home Builders challenge here. In a December 2008 letter from an EPA Assistant Administrator to an Assistant Secretary of the Army, EPA communicated that it had reviewed and was thereby affirming a navigability determination made by the Army Corps of Engineers' Los Angeles District regarding the Santa Cruz River. The District's staff had concluded, based on evidentiary analysis and on-site study, that two specified reaches of the Santa Cruz are traditional navigable waters. In particular, the District found that the reaches were deep and wide enough, with sufficient flow, to be commercially and recreationally navigated, that they had been so navigated, and were likely to

be in the future.[2]  EPA specified that the TNW Determination was consistent with the *Rapanos* Guidance, and that the agencies should immediately implement the determination in pending and future JDs for the Santa Cruz watershed.

Without more, the agencies' internal TNW Determination did not necessarily decide the Clean Water Act's applicability to Home Builders' properties.  None of their properties is alleged to be on the Santa Cruz River.  For land positioned away from the river, a JD could rely on the navigable reaches of the Santa Cruz as a point of reference in its *Rapanos* analysis, but would also have to contain a determination of a "significant nexus" between waters on the property and the navigable river reach.  And, to the extent that an approved JD relied on the Santa Cruz River TNW Determination, that determination would be subject at least to immediate administrative appeal.[3]

---

[2] The TNW Determination was made pursuant to a "special case" classification by EPA under a 1989 Memorandum of Agreement between the Corps and EPA, pursuant to which EPA, not the Corps, makes final jurisdictional decisions for purposes of 33 U.S.C. § 1344.

[3] There is some question whether landowners may seek immediate judicial review of an approved JD, other than within a challenge to a compliance order, permit denial, or other action applying the JD. The Fifth and Ninth Circuits say no, because issuance of an approved JD is not an action "'by which rights or obligations have been determined, or from which legal consequences will flow,'" *Belle*, 761 F.3d at 388, 390-94 (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)); *Fairbanks*, 543 F.3d at 591, 593-97 (same). The Eighth Circuit, by contrast, recently held that an approved JD, even without more, is subject to immediate judicial review. *Hawkes*, 2015 WL 1600465, at *4-7. We express no opinion on the question.

8

**II.**

**A.**

Home Builders filed their first lawsuit in 2009 challenging the agencies' 2008 TNW Determination, which identified reaches of the Santa Cruz River as traditional navigable waters within the jurisdiction of the Clean Water Act. The agencies disputed Home Builders' standing to sue. Home Builders claimed representational standing based on asserted concrete injury to their members from the agencies' designation of the Santa Cruz River—rather than the distant Colorado River, for example—as the traditional navigable water nearest to their property. Home Builders contended that the TNW Determination put its members to the choice of applying for a permit or facing enforcement penalties. They emphasized the cost of getting permits, and claimed that the TNW Determination burdened the investment and project-development activities of their members. Home Builders further argued that the agencies' determination amounted to a legislative rule, and that standing of regulated entities, such as their members, to challenge legislative rules is self-evident.

The district court dismissed the case, and a prior panel of this Court affirmed for want of standing.[4] 667 F.3d at 11-16.

---

[4] We discuss in text those aspects of our prior holding relevant to representational standing, the only theory of standing that Home Builders assert in this case. Home Builders' complaint also alleged what they characterized as organizational injury, but they did not brief that theory, which we rejected in *Home Builders I*. *See* 667 F.3d at 11-12. Nor do Home Builders reassert their previously rejected argument that they have standing based on deprivation of a procedural right *in vacuo*. *See id.* at 15-16.

The earlier panel stated that,

> [u]nless and until [an approved] jurisdictional determination applies the TNW Determination to particular property (and its watercourses) and finds a sufficient nexus—or the Agencies use the TNW Determination in an enforcement action against a party discharging without a permit—the owner or developer of the property suffers no incremental injury in fact from the TNW Determination and any challenge to it is therefore premature. In the meanwhile, [Home Builders'] members face only the *possibility* of regulation, as they did before the TNW Determination: Any watercourse on their property may (or may not) turn out to be subject to [Clean Water Act] dredging permit requirements because of a nexus (or not) with the two Santa Cruz reaches.

*Id.* at 13. Home Builders' argument that "the TNW Determination forecloses the issue of the nearest TNW for site-specific [JDs] within the watershed" was unconvincing, because an individual landowner or developer might still "contest the TNW Determination in a challenge to a site-specific [JD]." *Id.* at 14 (internal quotation marks, original alterations omitted). For example, a landowner faced with a compliance order, penalty assessment, or permit action predicated on the site-specific JD could certainly challenge it in that context. *See id.*; *see also supra* n.3. We were unpersuaded by Home Builders' assertion that its "members *now* face the choice of applying for a permit for activities that [they asserted] are outside the scope of the agencies' authority under the [Clean Water Act] or face significant civil or criminal enforcement penalties for failing to do so"; those were "the same statutory and regulatory alternatives . . . members faced before the TNW Determination." 667 F.3d at

14. With or without a generalized TNW Determination, the agencies could equally have concluded, in a site-specific JD, that the designated river reaches were traditional navigable waters. We noted that, "[w]ithout an additional allegation that the TNW [Determination] substantially increased the risk of regulation or enforcement relating to particular property," the TNW Determination caused no "concrete and particularized" and "actual or imminent" injury to any landowner for purposes of standing. *Id.*

Further, we recognized that the declarations of Home Builders' members did not allege that the TNW Determination "motivated the landowner to seek an application for a permit," nor did they explain how the declaratory or injunctive relief Home Builders sought "would remedy the *past* injuries the members may have already incurred in applying for the permits." *Id.* at 14-15. None of the declarations alleged facts demonstrating that there was a "greater likelihood of regulation, if any, after than before the TNW Determination," or that "any member plan[ned] in fact to discharge contaminants into a likely jurisdictional watercourse anytime soon." *Id.* at 15.

## B.

In 2013, Home Builders filed this case, raising the same legal challenges they pressed in *Home Builders I*, and praying for essentially the same declaratory relief.[5] Home Builders

_____

5 The current complaint no longer seeks a declaration from the federal courts that the two identified stretches of the Santa Cruz River are not traditional navigable waters. Home Builders dropped that prayer for relief presumably out of recognition that, if we were to declare unlawful and vacate the TNW Determination, it would be for the agencies in the first instance, not the courts, to make that

have again submitted supporting declarations from members, expanding on those submitted in the earlier case.

One declarant, developer Larry Kreis, states that the TNW Determination resulted in an "increased risk of regulation stem[ming] from the fact that [his] properties are now located within a few miles of the nearest TNW." Kreis Decl. ¶ 17. Kreis further states that, absent the TNW Determination, he "probably would have moved forward with development of the additional lands without filing an amended application [in 2012] because the minor, braided washes on the property would not have a significant nexus to the Colorado River or other TNW" besides the Santa Cruz. *Id.* ¶ 24. Kreis also recounts that, in 2005, the Corps issued an "Approved Jurisdictional Delineation" concerning one property; in 2011, he filed an application to discharge into two washes on that property that had been previously delineated as jurisdictional waters; and, in 2012, the Corps issued a permit accordingly. *Id.* ¶¶ 29-30. Kreis further states that he is "concerned about having to obtain a permit" for one of the properties he intends to develop. *Id.* ¶ 33. Another declarant, developer Jerry DeGrazia, states that the Corps issued preliminary JDs for certain of his properties after the district court's 2011 dismissal, DeGrazia Decl. ¶¶ 30, 35, and that the Corps has also issued a permit at one of his former properties, *id.* ¶¶ 20, 24-25.

The district court held that Home Builders lacked standing under the criteria identified in *Home Builders I*, and alternatively that Home Builders had failed to identify final

navigability determination (e.g., in a site-specific JD or a rulemaking).

agency action subject to APA review.[6]  956 F. Supp. 2d 198, 205-12 (D.D.C. 2013).

**III.**

We review de novo the district court's dismissal for lack of standing, accepting as true Home Builders' non-conclusory, factual allegations. *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).  To establish standing, Home Builders must show "that at least one of its members 'is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical'; it 'must be fairly traceable to the challenged action of the defendant'—namely the TNW Determination—and 'it must be likely that a favorable judicial decision will prevent or redress the injury.'" *Home Builders I*, 667 F.3d at 12 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Home Builders must allege ongoing or imminent injury, rather than purely past injury, because they seek only declaratory relief.  *Home Builders I*, 667 F.3d at 12, 14; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

**A.**

The doctrine of issue preclusion, or collateral estoppel, bars "successive litigation of an issue of fact or law actually litigated and resolved" that was "essential to the prior judgment, even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 & n.5 (2008) (internal quotation marks omitted); *see also Martin v. Dep't of*

---

[6] Under the law of this Circuit, final agency action is not a jurisdictional requirement, but bears on the existence of an APA claim. *Trudeau v. FTC*, 456 F.3d 178, 183-85 (D.C. Cir. 2006).

*Justice*, 488 F.3d 446, 454 (D.C. Cir. 2007). The doctrine serves to "protect against 'the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions.'" *Taylor*, 553 U.S. at 892 (brackets in original) (quoting *Montana v. United States*, 440 U.S. 147, 153-54 (1979)).

Issue preclusion applies to threshold jurisdictional issues like standing as well as issues going to a case's merits. *See, e.g.*, *Underwriters Nat'l Assurance Co. v. N.C. Life & Acc. & Health Ins. Guar. Ass'n*, 455 U.S. 691, 706 (1982); *Coll. Sports Council v. Dep't of Educ.*, 465 F.3d 20, 22-23 (D.C. Cir. 2006); *Dozier v. Ford Motor Co.*, 702 F.2d 1189, 1191 (D.C. Cir. 1983) (Scalia, J.). Issue preclusion operates differently from claim preclusion with respect to jurisdiction-based prior decisions: Because a jurisdictional dismissal does not involve "an adjudication on the merits," it "will not bar relitigation of the cause of action originally asserted," but it "may preclude . . . relitigation of the precise issues of jurisdiction adjudicated." *Cutler v. Hayes*, 818 F.2d 879, 888 (D.C. Cir. 1987). That is, "[a]lthough the dismissal of a complaint for lack of jurisdiction does not adjudicate the merit[s] so as to make the case *res judicata* on the substance of the asserted claim, it does adjudicate the court's jurisdiction, and a second complaint cannot command a second consideration of the same jurisdictional claims." *GAF Corp. v. United States*, 818 F.2d 901, 912 & n.72 (D.C. Cir. 1987) (internal quotation marks and citation omitted).

Unless Home Builders satisfy the "curable defect" exception that they claim shields them from issue preclusion, they are barred from relitigating here the standing issue decided in *Home Builders I*. The curable defect exception allows relitigation of jurisdictional dismissals when "a

'precondition requisite' to the court's proceeding with the original suit was not alleged or proven, and is supplied in the second suit." *Dozier*, 702 F.2d at 1192. The exception is sharply limited, however, by the requirement that new allegations of a sufficient "precondition requisite" identify "*occurrences subsequent to the original dismissal*" that "remed[y]" "the jurisdictional deficiency." *Id.* (emphasis in original); *accord GAF Corp.*, 818 F.2d at 912-13. The exception permits litigants whose claims were dismissed on jurisdictional grounds to establish jurisdiction in a subsequent case only if a material change following dismissal cured the original jurisdictional deficiency.[7] *Dozier*, 702 F.2d at 1192 & n. 5, 1193 n. 7. That limitation prevents the "curable defect" exception from undermining the preclusive effect of issues already fairly and finally determined in prior litigation. *Id.* at 1192-94; *see also Magnus Elecs., Inc. v. La Republica Argentina*, 830 F.2d 1396, 1400-01 (7th Cir. 1987).

**B.**

Issue preclusion bars us from reconsidering whether Home Builders suffered Article III injury, unless they have alleged that events after the original dismissal cure the jurisdictional inadequacy identified in *Home Builders I*. Plaintiffs failed in *Home Builders I* to allege at least one of following types of harm, and thus were unable to establish constitutionally cognizable injury traceable to the TNW

---

[7] We look to the August 2010 date of the district court's dismissal in *Home Builders I* as the relevant date for purposes of the curable defect exception. That is consistent with the logic of the opportunities that procedural rules provide for plaintiffs to amend complaints prior to dismissal, *see Dozier*, 702 F.2d at 1192-93 & n.6, and in any event, it is the date that the Agencies propose and is more favorable to Home Builders than the 2011 date of this Court's affirmance.

Determination:  (1) application of the TNW Determination to a particular site in an approved JD or an enforcement action based on the TNW Determination, 667 F.3d at 13; (2) plans imminently to discharge into a likely jurisdictional watercourse, *id.* at 15; or (3) substantially increased risk of regulation or enforcement at a specific site in light of the TNW Determination, *id*. at 14.  None of Home Builders' new declarations makes up for any of the prior shortfalls or adds any new evidence of standing.

For one, *Home Builders I* required approved JDs for the requisite injury, *id.* at 13,  yet Home Builders' new declarations refer only to preliminary JDs or, in one case, to an approved JD that preceded the challenged TNW determination.[8]  Moreover, Home Builders fail to allege that any JD applied the TNW Determination.  *See, e.g.*, DeGrazia Decl. ¶¶ 30, 35 (alleging that preliminary JDs identified "potentially jurisdictional" waters and referenced the Santa Cruz River, but not that they relied on the TNW Determination).  The TNW Determination was not a predicate to Kreis's 2012 permit, either:  The washes that necessitated that permit were delineated as jurisdictional years earlier, in a 2005 approved JD.  *See* Kreis Decl. ¶¶ 29-30.  Home Builders also allege the issuance of a permit (based on a preliminary JD) at one member's former property, DeGrazia Decl. ¶¶ 20,

---

[8] When we stated that no Article III injury has occurred "[u]nless and until *such* a jurisdictional determination applies the TNW Determination," we cited the definition of approved JDs.  667 F.3d at 13 (emphasis added).  Preliminary JDs merely advise that there "may be" jurisdictional waters on a site.  33 C.F.R. § 331.2.  We also emphasized the "prematur[ity]" of a challenge so long as it remains the case that "[a]ny watercourse on the[] property may (or may not) turn out to be subject to [Clean Water Act] . . . permit requirements because of a nexus (or not) with the two Santa Cruz reaches."  667 F.3d at 13.

24-25, but because that member no longer owns that property, the requested declaratory relief could not redress his alleged injury there, *see Home Builders I*, 667 F.3d at 12, 14.

Nor have Home Builders shown plans imminently to discharge into a likely jurisdictional watercourse. Home Builders' allegations that "development activities on [member] property will result in discharges" into washes that are allegedly tributaries of the Santa Cruz, Kreis. Decl. ¶ 33, are materially the same as those we previously held to be insufficiently concrete and imminent, *see Home Builders I*, 667 F.3d at 15. We found allegations that members "'regularly' undert[ook] construction projects" that could not "be conducted without impacting [certain water features] within the Santa Cruz River watershed" were not allegations of discharges "any time soon," and thus fell short of "'establishing certainly impending dangers.'" *Id.*

Finally, a principal focus of Home Builders' renewed standing case is what they see as increased risk of regulation. Their complaint is that the TNW Determination makes it "more difficult to challenge the assertion of CWA jurisdiction over the washes" on their members' property. Kreis Decl. ¶ 31.[9] Any such harm is not an "occurrence[] subsequent to the original dismissal," *Dozier*, 702 F.2d at 1192 (emphasis omitted), but had already happened when Home Builders litigated standing in *Home Builders I*—indeed, it was the

---

[9] *See also* Kreis Decl. ¶ 35 ("we have a very small chance of demonstrating that the washes are not 'waters of [the] United States'"); *id.* ¶ 17 ("Following the [TNW Determination], it became far more likely that [water features] on our properties will constitute 'waters of the United States,'" thereby posing an "increased risk of regulation"); DeGrazia Decl. ¶ 32 ("Absent the [TNW Determination], I would have been able to demonstrate the lack of any significant . . . nexus.").

basis of that suit. Our opinion in *Home Builders I* cannot be used as a mere instruction manual on how Home Builders might correct defects in its claim of standing by doing a better job of pleading preexisting facts and arguing the law more forcefully in a new case. *See, e.g.*, *id.* at 1193-94 & n.6; *Magnus Electronics*, 830 F.2d at 1400-01; *cf. Montana*, 440 U.S. at 153-54.

Relatedly, Home Builders contend that "the regulated community normally has standing to bring facial challenges to agency rules that regulate their members' activities," Appellant Br. 34, and that their standing in this case "should be self-evident, given that their members' land development activities are regulated by the challenged agency rule," Appellant Reply 14. They are correct that regulated entities' standing to challenge the rules that govern them is "normally not an issue," Appellant Br. 30; Appellant Reply 10 (same), because regulatory constraints typically qualify as injury in fact, *see, e.g., Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733 (D.C. Cir. 2003); *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002). Such standing is not, however, automatic, but depends on plaintiffs showing that they satisfy the doctrinal requirements of Article III. *See, e.g.*, *Lujan*, 504 U.S. at 561-62, 571-73; *CTS Corp. v. EPA*, 759 F.3d 52, 57-58 (D.C. Cir. 2014) (recognizing that the "court, as a matter of constitutional duty, must assure itself of its jurisdiction to act in every case," including where a corporation challenged an EPA listing action that harmed the firm's reputation and increased its risk of liability); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1286-87 (D.C. Cir. 2005) (observing that organizations representing regulated parties must "satisfy the 'irreducible constitutional minimum' of Article III standing"); *CropLife Am. v. EPA*, 329 F.3d 876, 884 (D.C. Cir. 2003) (concluding that binding agency directive caused injury to

industry petitioners that was sufficiently concrete and redressable to satisfy *Lujan*). In regulated-party cases, as in other types of challenges, "standing is always a case- and context-specific inquiry." *CTS*, 759 F.3d at 58. For the reasons already set forth, Home Builders have failed to show Article III injury in a manner that satisfies the curable defect exception to issue preclusion.

We are bound by the conclusion in *Home Builders I* that Plaintiffs alleged no actual or imminent harm that is sufficiently concrete and particularized to support their Article III standing. Because Home Builders have not found a new cure for the fatal standing defect in their first suit, issue preclusion must bar this second attempt.

\* \* \*

Because we affirm for lack of standing, we need not decide whether the TNW Determination constitutes final agency action.

*It is so ordered.*

SILBERMAN, *Senior Circuit Judge*, concurring, with whom SENTELLE, *Senior Circuit Judge*, joins: I agree with the court that we are precluded by our prior opinion from acknowledging appellants' standing. I write separately because I think *Home Builders I*[1] is incorrectly decided and is quite at odds with our jurisprudence. To put it bluntly, it sticks out like a sore thumb.

**I**.

Our prior holding, which binds us, concluded that appellants did not have standing unless and until their members were a target of an enforcement action (charging illegal discharge) or the government (the Corps of Engineers) issued an "approved jurisdictional determination." That latter action follows a request of a property owner for the government's official position as to whether its property contains "waters of the United States" or navigable waters of the United States. In other words, our prior opinion concluded that appellants lacked standing to challenge the alleged rule until the government took official action to assert authority over a member of appellants' associations. I believe that reasoning conflates the appropriate standing analysis for an adjudicatory challenge and a challenge to a rulemaking. The latter asks only whether parties are likely covered by the regulation — or purported regulation — not whether the government has actually started an enforcement action or officially asserted a right to do so.

Of course, for standing purposes, we must assume the validity of appellants' challenge on the merits; i.e., we must assume that when the EPA issued a "determination" asserting that more than 50 miles of the Santa Cruz River were designated as traditional navigable waters, it should have done so through

---

[1] Judge Kavanaugh did not join the court's core standing analysis.

a traditional rulemaking under section 553 of the APA. This designation  it is undisputed  affected the entire watershed of the Santa Cruz River, roughly 8,600 square miles, which means that developers were more likely to encounter regulatory obstacles to development. That is because the agency is bound to apply the designation in individual jurisdictional determinations and permitting decisions.

Previously, as Corps staff members observed in emails urging the EPA to affirm the Corps' recommendation, the nearest traditional navigable water to that watershed basin was likely 300 miles away. Post-*Rapanos*, the agencies had not taken the position that land parcels within the watershed were categorically affected by the presence of a traditional navigable water (that is, to the extent a parcel containing a water feature has a significant nexus to the Santa Cruz River). To reiterate, in asking whether appellants have standing, the question is exactly the same as asking whether they would have had standing to challenge this legal position if it were embodied in an APA rule.

And the law is rather clear; any party covered by an agency's regulatory action has standing to challenge a rule when it issues  it certainly need not wait until a government agency seeks to enforce a rule. *See Chamber of Commerce v. Fed. Election Comm'n*, 69 F.3d 600, 604 (D.C. Cir. 1995). That proposition is so clearly established it is beyond question. Nor do parties have to wait until the government takes preliminary steps before enforcing  clearing its throat, so to speak. It is only necessary for a potential litigant to show that it is part of the regulated class and its behavior is likely affected by the government's action.

It seems to me that any property owner in the Santa Cruz watershed who contemplated development and therefore would need a permit from the Corps if its property had a significant nexus to the river, is covered by the regulation. As the court points out, a significant nexus is much more than an abutment to or direct tributary of the river; it can include desert washes, arroyos or any other particular drainage feature that exists in response to local precipitation. Although it is not determinative, by virtue of the regulation, that a particular landowner is affected by the rule, it is fair to assume that a local developer would *potentially* fall into that category. *See JEM Broad. Co. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994) (holding that any person or entity within the class affected by the FCC's "hard look" rules, that is, actual or *potential* license applicants, had standing to challenge the rules as illegally promulgated). Essentially that was the position of appellants representing developers in our primary case.

I think that would have sufficed for standing under our cases. *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1286-87 (D.C. Cir. 2005) ("[I]t is fairly 'self-evident' that the various appellants as representatives of the regulated parties . . . [have] Article III standing"); *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) (if a petitioner is an object of the agency action or is directly affected by it   as is the case usually in a rulemaking   there should be little question that it has standing); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733-34 (D.C. Cir. 2003) (standing can be self-evident when the challenged rule directly regulates the disposition of a petitioner's property); *Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1119 (D.C. Cir. 2005) (previously unregulated independent computer reservation system operator had standing to challenge an FAA regulation that subjected it to

the Department's regulatory authority); *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 93 (D.C. Cir. 2005) (congressmen had standing to launch a conventional administrative law claim, i.e., a facial challenge to allegedly invalid regulations affecting their interests); *Am. Trucking Ass'n., Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013) (an association created to promote and protect the interests of the trucking industry had representational standing because it had an obvious interest in challenging a rule that directly and negatively impacts its members); *Nat'l Min. Ass'n. v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1401 (D.C. Cir. 1998) (omitting mention of standing (surely because it was so obvious), allowing trade association whose members engage in dredging and excavation to mount a facial challenge to the Corps' amendment of a regulation defining section 404's term "discharge of dredged material").

In the case before us    our second case    we have even more.  We have affidavits of developers who had obtained "preliminary jurisdictional determinations."    Under the government's regulations, a party can hire a consultant to examine its property and prepare a report determining whether it has "waters of the United States" on its property, and therefore must obtain a permit to proceed with development. (After the EPA issued the determination any amount of water on a particular property has different legal significance). The consultant report is submitted to the Corps and qualifies as a "preliminary jurisdictional determination" upon the Corps' adoption of it, oftentimes with edits.  There can be no doubt that such affidavits show standing under any interpretation of our prior cases    or for that matter, I suspect any other court's cases. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992)

(an affidavit that a person was planning to visit a particular location would be sufficient to show Article III injury).

Because the opinion we are obliged to follow is so much out of step with our case law it should not have continuing jurisprudential significance. And Home Builders should be able to easily establish standing upon the government's issuance of either an "approved jurisdictional determination" or permit applying the navigability determination (rule?).