[Cite as *In re Chardon Twp. Wastewater Treatment Plant & Sewer Project*, 2022-Ohio-332.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## GEAUGA COUNTY

IN RE:

CHARDON TOWNSHIP
WASTE WATER TREATMENT
PLANT & SEWER PROJECT

**CASE NO. 2020-G-0262**

Civil Appeal from the
Court of Common Pleas, Probate Division

Trial Court No. 2019 PC 000503

**O P I N I O N**

Decided: February 7, 2022
Judgment:  Reversed and entered for appellant

*Edward A. Proctor*, Kim & Associates, 4100 Embassy Parkway, Suite 200, Akron, OH 44333 (For Appellee Joanne Eging).

*James R. Flaiz,* Geauga County Prosecutor, and *Susan T. Wieland*, Assistant Prosecutor, Courthouse Annex, 231 Main Street, Chardon, OH 44024 (For Appellant Geauga County Board of Commissioners).

THOMAS R. WRIGHT, P.J.

{¶1}   Geauga County Board of Commissioners ("Board") appeals the probate court's judgment in favor of Joanne Eging on her statutory appeal from an improvement resolution ("Resolution") adopted by the Board on October 29, 2019, under R.C. Chapter 6117 ("Sewer Districts; County Sewers").  The probate court's judgment is reversed, and judgment is entered for the Board.

{¶2}   The Board advances the following three assignments of error:

[1.] The probate court erred when it failed to comply with the statutory framework regarding an appeal pursuant to Ohio Revised Code Section 6117.09.

[2.] [T]he probate court erred when it extended orders affecting the Geauga County Health District and property owners who failed to effect an appeal.

[3.] The probate court erred in finding that appellee met her burden regarding the proposed boundary and apportionment of the project.

{¶3} The subject of this appeal dates back to 2013, when Chardon Township Board of Trustees ("Trustees") requested Geauga County Department of Water Resources ("Water Resources") test effluent being discharged from a pipe on Henning Drive, located in the Berkshire Heights Subdivision ("Subdivision") of Chardon Township. The test samples contained unacceptable levels of fecal coliform, prompting the Trustees to submit a written complaint to the Ohio Environmental Protection Agency ("Ohio EPA"), declaring that the unsanitary conditions of the tested site may be causing harm to the stream and the Chagrin River.

{¶4} The Subdivision is comprised of five streets—Henning Drive, Howard Drive, Thwing Road, Olmar Drive, and Helmut Drive—with 113 residences situated on 114 properties. Wastewater treatment for the Subdivision is currently provided by individual household septic systems, which are either updated on-lot systems or original off-site discharging systems.

{¶5} The Ohio EPA investigated the conditions in April 2014, finding unacceptable levels of E. coli in four roadside drainage ditches and a receiving stream of the East Branch of the Chagrin River. The individual household septic systems were not tested. The Director of the Ohio EPA informed the Board on August 1, 2014, that "it is necessary for the public health and welfare that corrective action, in the form of the construction, maintenance and operation of sanitary facilities to serve the subdivision, be

2

undertaken." The Board voted to execute the Director's Final Findings and Orders for abating the public health nuisance on March 17, 2015.

{¶6} The Board initially advocated for individual testing and replacement of the household systems, which was not accepted by the EPA due to the age of the systems, average lot size, and soil conditions. Eventually, the EPA accepted the Board's proposal of installing sanitary sewer lines for the entire Subdivision. By resolution on August 27, 2019, the Board approved the plans, specifications, estimates of cost, and tentative assessments for and determining the necessity of constructing sanitary sewers to provide service to the Subdivision. The Board provided the required notice to the Subdivision property owners.

{¶7} At a public Board meeting held September 24, 2019, the Director of Water Resources Steven Oluic presented information regarding the sanitary sewer project. The estimated cost was $4,523,000.00, to be paid through a funding plan comprised of various low-interest loans and grants in addition to an assessment against the 113 residential property owners of the Subdivision. The recommended assessment was $28,000.00 per household, at an annual cost of $1,245.68 for 30 years. Additionally, each homeowner will be responsible for the cost of connecting to the sewer line and abandoning the septic system, estimated at approximately $4,500.00 to $7,500.00 per household, and a bi-monthly sewer bill of $109.00. Within five days of the meeting, the Board received numerous written objections from property owners, including from Joanne Eging, appellee herein.

{¶8} On October 29, 2019, the Board denied all objections and passed the Resolution that determined to proceed with the construction of the Chardon Township

3

Wastewater Treatment Plant and Sewer Project ("Project") to provide sanitary sewer service to all properties in the Subdivision. The Resolution also ratified the plans and specifications for the Project, the character and termini thereof, the boundaries of the assessment district, and the tentative assessments and estimated cost for the Project.

{¶9} Only two of the 113 residential property owners within the assessment district, including Ms. Eging, appealed the Resolution to the Probate Division of the Geauga County Court of Common Pleas. The appeals were brought pursuant to R.C. 6117.09(B) and (C) on the issues of the boundaries and tentative apportionment of the assessment.

{¶10} The parties stipulated, inter alia, that "Geauga County is under Findings and Orders from the [Ohio EPA] pursuant to Ohio Revised Code section 6117.09(A) [i.e., 'The necessity of the improvement, including the question whether the cost of the improvement will exceed the benefits resulting therefrom.']."

{¶11} The two appeals were tried together. *See* R.C. 6117.16 (the appeals shall be tried together, but the rights of each person shall be separately determined). Over multiple days, the probate court heard from both appellants, the former and current directors of Water Resources, and representatives from the Ohio EPA and the Geauga County Public Health District ("Health District"). The probate court's written decision was issued August 26, 2020, and is substantially the same in each appeal. *See also DiCillo v. Geauga Cty. Bd of Commrs.*, 11th Dist. Geauga No. 2020-G-0263 (appeal from Geauga County No. 2019 PC 000504).

{¶12} The probate court rendered judgment in favor of Ms. Eging, concluding the Board's Resolution as applied to her and others similarly situated is arbitrary and

4

Case No. 2020-G-0262

unconstitutional and, as such, void. The court enjoined the Board (1) from including Ms. Eging's property within the boundaries of the Project; (2) from assessing any portion of the cost of the Project against Ms. Eging; (3) from assessing any connection cost to Ms. Eging, as long as the household septic system serving her property has been individually tested, is properly functioning, and is not causing a public health nuisance; and (4) from ordering Ms. Eging to connect her premises to the Project under either R.C. 6117.51(C) or (D). The probate court further enjoined the Board from including *any* Subdivision household or residential property as it relates to the boundaries and assessment of the Project, *unless and until* the Board conducts an individual test of that specific household septic system and determines it is actually causing or contributing to a public health nuisance.

{¶13} The Board's authority to assess the cost of the Project upon the Subdivision property owners is derived from the Ohio EPA Director's Final Findings and Orders, which was issued pursuant to R.C. 6117.34:

> Whenever * * * a board of township trustees makes complaint, in writing, to the [Ohio EPA] that unsanitary conditions exist in any county, the agency's director forthwith shall inquire into and investigate the conditions complained of. *If, upon investigation of the complaint, the director finds that it is necessary for the public health and welfare that sanitary or drainage facilities * * * be acquired or constructed, maintained, and operated* to serve any territory outside municipal corporations in any county, the director shall notify the board of county commissioners of the county of that finding and order that corrective action be taken. *The board shall obey the order and proceed as provided in this chapter* to establish a county sewer district, if required, to provide the necessary funds, to acquire or construct the facilities, and to maintain and operate the facilities, as required by the order and in a manner satisfactory to the director. *Any part or all of the cost of the facilities or of the maintenance and operation of the*

5

*facilities may be assessed upon the benefited properties as provided in this chapter.*

(Emphasis added.)

{¶14} A property owner's appeal from, and a probate court's inquiry into, the actions of a board of commissioners under R.C. 6117.34 is limited by R.C. 6117.09:

> Any owner of property to be assessed or taxed for an improvement under sections 6117.01 to 6117.45 or sections 6103.01 to 6103.30 of the Revised Code, may appeal to the probate court from the action of the board of county commissioners in determining to proceed with the improvement in regard to any of the following matters:
>
> (A) The necessity of the improvement, including the question whether the cost of the improvement will exceed the benefits resulting therefrom;
>
> (B) Boundaries of the assessment district;
>
> (C) The tentative apportionment of the assessment.
>
> Such appeal shall be effected within ten days after the passage of the resolution to proceed with the improvement.
>
> * * * *If the director of environmental protection has made an order declaring that any improvement is necessary for the public health and welfare as provided in section 6117.34 or 6103.17 of the Revised Code, no property owner shall have the right to appeal from the action of the board declaring such improvement necessary.*

(Emphasis added.)

{¶15} Here, the Director of the Ohio EPA made an order declaring that the Project was necessary for the public health and welfare as provided in R.C. 6117.34. The parties also stipulated that "Geauga County is under Findings and Orders from the [Ohio EPA] pursuant to Ohio Revised Code section 6117.09(A)." Thus, the appeal in this matter was limited to the boundaries and tentative apportionment of the assessment.

6

Case No. 2020-G-0262

{¶16} Although not contested at the hearings, Ms. Eging argues on appeal that this limitation contravenes an instruction found in R.C. 6117.17, which provides for "findings of court":

> At the conclusion of the trial provided for in section 6117.15 of the Revised Code, the probate court * * * shall determine whether the improvement petitioned for or granted will be necessary for the public health, convenience, or welfare, or whether the cost of it will exceed the benefit resulting from such improvement, or whether the boundaries of the assessment district should be modified, if the appeal is from an order establishing the proposed improvement or dismissing or refusing to grant the prayer of the petition or establishing the boundaries of the assessment district.

{¶17} This instruction is clearly limited to an appeal from an action of the board of county commissioners granting or denying a petition for an improvement. It is further limited, in para materia, by whether the property owner was permitted in the first instance to place the issue of necessity before the probate court. Here, because the Board was acting under an order of the Ohio EPA declaring necessity, and not upon a petition for an improvement, Ms. Eging was not permitted to raise the issue of necessity, the probate court was not permitted to address the issue, and this portion of R.C. 6117.17 is inapplicable.

{¶18} The probate court, in its entry and at hearings, regularly acknowledged this limitation upon its appellate review. Under the Board's first and second assigned errors, however, the Board argues the probate court exceeded its jurisdiction by framing an examination of the necessity of the Project in terms of boundary and apportionment of the assessment. The Board further posits the probate court acted contrary to law by issuing orders that impeded the statutory authority of the Ohio EPA and the Health District and by extending those orders to property owners who did not appeal the Resolution.

7

{¶19} Issues of jurisdiction and other questions of law are reviewed de novo. *Chapman v. Chapman*, 11th Dist. Lake No. 2015-L-039, 2015-Ohio-4833, ¶ 51, citing *Yu v. Zhang,* 175 Ohio App.3d 83, 2008-Ohio-400, 885 N.E.2d 278, ¶ 16 (2d Dist.).

{¶20} The legislature has required that the state be divided into health districts, with the townships and villages in each county combined into a "general health district." R.C. 3709.01. Boards of health of a general health district are required to enforce the rules adopted by the Ohio Department of Health. R.C. 3701.56. Pursuant to the Ohio Department of Health's authority to establish rules of general application throughout the state, "the health department established a policy requiring the elimination of individual septic systems and connection to a sanitary sewage system when such a system becomes accessible." *Bacak v. Trumbull Cty. Bd. of Commrs.*, 2016-Ohio-4737, 57 N.E.3d 1176, ¶ 26 (11th Dist.), citing R.C. 3701.34. "It is well established that local boards of health have the authority to require that a household sewer be directly connected to a sanitary sewerage system whenever such a system becomes accessible to the property." *Clark v. Greene Cty. Combined Health Dist.*, 108 Ohio St.3d 427, 2006-Ohio-1326, 844 N.E.2d 330, ¶ 17, citing *DeMoise v. Dowell*, 10 Ohio St.3d 92, 461 N.E.2d 1286 (1984), syllabus; *see also* R.C. 6117.51.

{¶21} Moreover, Ohio Adm.Code 3701-29-06(I) provides:

> A STS [(household sewage treatment system)] shall not be sited, permitted, or installed where a sanitary sewerage system is accessible, unless otherwise excepted by law. Whenever a sanitary sewerage system becomes accessible to a dwelling or structure served by a STS, the dwelling and/or structures shall be connected to the sanitary sewerage system and the STS abandoned in accordance with rule 3701-29-21 of the Administrative Code.

8

Case No. 2020-G-0262

"This authority applies regardless of the manner by which the sewerage system was constructed. Moreover, such a requirement is not arbitrary or unreasonable and does not constitute a deprivation of due process of law." *Clark* at ¶ 17, citing *DeMoise* at syllabus.

{¶22} The probate court, in a footnote of its entry, describes the Supreme Court's holding in *DeMoise,* without mention of *Clark,* as "an apparent preference for the extension of sanitary sewers over individual household sewage systems * * * [that] does not apply here because there are household sewage systems with less e-coli levels than the Ohio EPA permissible limit for the proposed sewage sanitary plant * * * [and m]oreover, the Ohio Supreme Court, subsequently, reaffirmed that private property rights are among the most revered in our law and traditions." The probate court describes a "constitutional disconnect" between the valid purposes of maintaining clean water and avoiding public health nuisances and, on the other hand, requiring all homeowners in the Subdivision to be assessed for the Project, "even though there is no evidence of the actual source of the effluent or that replacing their individual septic systems with a new sewer system would resolve the offending effluent situation." The probate court concludes, therefore, that the assessment amounts to an unconstitutional taking because, without individual testing, the Project is based on "unscientific speculation and mere topography."

{¶23} This analysis reveals the probate court's extra-jurisdictional examination of the necessity of the Project. Further, "[t]he legislative delegation of authority, under the present scheme, does not bear out this contention. Instead, it reflects a broad-based policy determination that individual household sewage disposal systems are inherently more dangerous to the public health than sanitary sewerage systems and must be replaced when possible." *DeMoise,* 10 Ohio St.3d at 95-96; *Clark*, 2006-Ohio-1326, at ¶

9

18. "*It is not necessary that the board make a case-by-case evaluation of the efficiency of each septic system.*  The determination has already been made that septic systems pose a potential hazard to the public health, and that they are a potential nuisance to be prevented when possible."  (Emphasis added.)  *DeMoise* at 96; *Portage Cty. Commrs. v. Warren*, 11th Dist. Portage No. 91-P-2339, 1992 WL 86519, *1 (Mar. 27, 1992).  Perhaps more importantly, the Supreme Court held—contrary to the probate court's determination—that, despite the presence of a property interest in one's septic system, the protections afforded by the constitutional takings clause are not absolute:

> Almost every exercise of the police power interferes with the enjoyment of liberty or the acquisition, production or possession of property. Yet the constitutional provisions against the taking of property must give way to an exercise of the police power " * * * if it bears a real and substantial relation to the public health, safety, morals or general welfare of the public and if it is not unreasonable or arbitrary." *Benjamin v. Columbus*, 167 Ohio St. 103, 146 N.E.2d 854 (1957), paragraph five of the syllabus; *Porter v. Oberlin*, 1 Ohio St.2d 143, 205 N.E.2d 363 (1965); *Downing v. Cook,* 69 Ohio St.2d 149, 431 N.E.2d 995 (1982).

> Furthermore, this court has repeatedly recognized that whether an exercise of police power is really and substantially related to the public health, safety and morals and whether it is unreasonable or arbitrary are questions initially committed to the judgment and discretion of the legislative body. The courts will not invalidate an exercise of the police power unless the legislative body's determination on the foregoing questions appears to be clearly erroneous. *Benjamin* at paragraph six of the syllabus; *Ohio Edison Co. v. Power Siting Comm.*, 56 Ohio St.2d 212, 218, 383 N.E.2d 588 (1978).

*DeMoise* at 96-97.

{¶24} The probate court's attempt to distinguish *DeMoise* because "there are household sewage systems with less e-coli levels than the Ohio EPA permissible limit for the proposed sewage sanitary plant" also ignores the testimony of Dean Stoll, supervisor

in the Division of Surface Water for the Ohio EPA, and of Gerard Morgan, the Geauga County Administrator and Sanitary Engineer. They explained that the permissible limit of E. coli for wastewater treatment plants is not the same as the permissible limit for household septic systems because the former produces high quality effluent and is discharged into a stream with additional water volume, while the latter is discharged into either a roadside ditch or into the soil on the lot.

{¶25} The Ohio EPA's standard for determining when an unsanitary condition exists for purposes of R.C. 6117.34 is set forth in Ohio Adm.Code 3745-1-04(F), which provides that all surface waters of the state shall be "[f]ree from public health nuisances associated with raw or poorly treated sewage[.]" At the time of the trial in this matter, a public health nuisance shall be deemed to exist when an inspection, conducted by or under the supervision of the Ohio EPA or a registered sanitarian, documents both (a) odor, color or other visual manifestations of raw or poorly treated sewage; and, (b) when five or fewer samples are collected, two or more samples exceed 1,030 E. coli counts per 100 milliliters ("cts/100ml"). At the time of the Ohio EPA's testing and the Director's Final Findings and Orders, the E. coli standard was 576 cts/100ml.

{¶26} Mr. Stoll testified that on two dates in April 2014, five surface water samples were taken from locations within the Subdivision where there was an odor and visual evidence of raw sewage—a receiving stream to the East Branch of the Chagrin River and four drainage ditches. The E. coli results ranged from 1,800 cts/100ml to 1,100,000 cts/100ml, the latter being one of the highest bacteria samples Mr. Stoll's office has ever received. According to Mr. Stoll, these numbers are "indicative of widespread septic system failure."

11

{¶27} The results were sufficient to prompt the Ohio EPA's finding of a public health nuisance and provided the agency with authority under R.C. 6117.34 to issue Findings and Orders requiring the installation of sanitary sewers and, if necessary, a wastewater treatment plant. *See* Ohio Adm.Code 3745-1-04(F)(2) ("Paragraph (F)(1) of this rule may be used by the appropriate authorities to document the existence of unsanitary conditions as described in section 6117.34 of the Revised Code.").

{¶28} Once the Ohio EPA declared the Project was necessary for the public health and welfare, as provided in R.C. 6117.34, the probate court had no jurisdiction on an appeal from the Board's subsequent actions to review the Ohio EPA's determination. The Board is required to continue with construction of the Project, regardless of the outcome of these proceedings, because the necessity determination was rendered by the Ohio EPA; the only question is who will pay for the Project, and how much will they pay. *See also* R.C. 6117.23 (if an appeal is prosecuted from the judgment of the court as to necessity, construction must cease; if an appeal is prosecuted as to the inclusion of any property in the assessment district or as to the apportionment of the tentative assessment, construction may continue in accordance with the transcript of the probate court and may thereafter be adjusted).

{¶29} In essence, despite this limitation, the probate court's order for additional testing is in pursuit of a necessity determination for each individual septic system in the assessment district before the Board may proceed. And, regardless of how an individual septic system tests, the property owner will still be required to abandon it and connect to the sewer line once it is accessible, as outlined in the law stated above.

12

{¶30} Further, the probate court had no statutory authority to issue any orders with respect to the property owners who did not appeal the Resolution. *See* R.C. 6117.09 (the appeal shall be effected by the property owner within 10 days of the resolution); R.C. 6117.17 ("the probate court shall find separately upon each claim for adjustment of the apportionment of the tentative assessment"); R.C. 6117.16 ("the rights of each person, firm, or corporation as to the inclusion of their property in the assessment district or as to the apportionment of the tentative assessment shall be separately determined by the court in its verdict"); R.C. 6117.23 ("If an appeal is prosecuted from the judgment of the court as to the inclusion of any property in the assessment district * * *"); R.C. 6117.24 ("if there is manifest error in such proceedings affecting the right of the plaintiff in such action, [the court] may set such proceedings aside as to him without affecting the rights or liabilities of the other parties in interest").

{¶31} Accordingly, we conclude that the probate court exceeded its jurisdiction, acted contrary to law, and impeded the statutory enforcement duties of the Ohio EPA and the Health District by ordering the Board to conduct additional testing, by enjoining the Board from requiring connection to an available sanitary sewer system unless and until it is determined the individual septic system is causing a public health nuisance, and by extending its orders to the property owners in the assessment district who did not appeal the Resolution.

{¶32} The Board's first and second assigned errors have merit.

{¶33} Under its third assigned error, the Board argues the probate court erred in ruling in favor of Ms. Eging on the issues of the boundaries and tentative apportionment of the assessment as provided in R.C. 6117.09(B) and (C).

13

{¶34} If the probate court finds "there is manifest error in such proceedings affecting the right of the plaintiff in such action, [it] may set such proceedings aside as to [the plaintiff] without affecting the rights or liabilities of the other parties in interest." R.C. 6117.24. "[W]ithout finding error the court may correct any gross injustice in the assessment made by the board of county commissioners." *Id.*

{¶35} R.C. 6117.09(B) "permits the Probate Court to look at the boundaries of the assessment district—that is to determine whether or not certain lots and/or areas will be benefited by the improvement, and therefore included in or out of the district." *In re Northgate Special Assessments*, 5th Dist. Guernsey Nos. CA-823 to CA-825, 1987 WL 11005, *3 (May 12, 1987). "Legislative bodies in Ohio have broad discretion to decide where to draw the boundary lines between assessed and non-assessed properties. This discretionary power will be upheld as long as it is neither arbitrary [nor] fraudulent." *Hartman v. Bd. of Commrs. of Trumbull Cty*, 11th Dist. Trumbull No. 3452, 1985 WL 4946, *3 (Dec. 31, 1985), citing *Schiff v. Columbus*, 9 Ohio St.2d 31 (1967).

{¶36} Here, the probate court "[found] that ordering any homeowner who has a properly functioning household wastewater treatment system to use and tap into a costly central sewer treatment system, where the source of the effluent is unknown, or where it is unknown that a household wastewater (septic) treatment system is a source of the contributing effluent situation, is by definition arbitrary."

{¶37} As stated above, however, the Supreme Court of Ohio has held that "such a requirement," by definition, "is *not* arbitrary *or* unreasonable and does *not* constitute a deprivation of due process of law." (Emphasis added.) *Clark*, 108 Ohio St.3d 427, at ¶ 17, citing *DeMoise*, 10 Ohio St.3d 92, at syllabus. Further, the sewer connection

14

requirement is uniformly applicable within the assessment boundaries and does not provide for discretionary exemptions. *See DeMoise* at 97 (distinguishing the arbitrariness found violative of equal protection in *Weber v. Bd. of Health*, 148 Ohio St. 389, 74 N.E.2d 331 (1947)).

{¶38} The probate court also expressed that it was "perplex[ed]" with the Board's decision not to include within the assessment boundaries two homes on Thwing Road near the drainage stream and a golf course located on the opposite side of Thwing Road, which, "likely, provides more effluent than a single family house" within the Subdivision.

{¶39} The Board's decision in this regard was explained by the testimony of Gerard Morgan, the Geauga County Administrator and Sanitary Engineer (and former Director of Water Resources). He testified that the two homes on Thwing Road were not included in the assessment district "due to the fact that the testing was all done on the other side of the stream," and, although the wastewater treatment plant will be located directly to the east of those homes, the sewer line will not run in front of them for tie-in purposes. Instead, a pump station will be located on the west side of the stream, which will force the wastewater to the plant. To provide sewer service to those two homes on the other side of the stream, Mr. Morgan explained, "would greatly increase the overall cost of the project." Mr. Morgan further testified that the wastewater plant will only be able to handle the capacity of the Subdivision and is not designed for expansion; i.e., if later development occurs and requests to tie into the sewer line, the developers would be charged to upgrade the existing plant or to build an additional plant. Mr. Morgan testified that the golf course is not connecting to the sewer line at this time. The county purchased a lot from the golf course owners on which the wastewater plant will be located. Part of

15

that purchase agreement, in order for the county to negotiate a lower price, is that the golf course clubhouse will be permitted to tie in at a later date if it chooses and will be responsible for those costs. Additionally, Mr. Morgan testified, other properties that would have been included in the assessment district based on topography (e.g., a mobile home park and a restaurant) are already serviced by existing and properly functioning wastewater treatment plants, and another subdivision to the west "flows" in the opposite direction of the stream and the East Branch of the Chagrin River. Mr. Morgan further stated that the assessment boundaries were chosen based on the locations of the surface water samples, the topography of the land ("the slopes and the grades in the area"), and the fact that the majority of the septic systems in the Subdivision are original from the 1950's and 1960's—66 off-lot discharging systems, to be exact—which he testified are all a potential for a public health nuisance.

{¶40} Mr. Morgan additionally testified to negotiations that occurred between the county and the Ohio EPA prior to the final boundary assessment. The county initially requested testing the individual systems to determine which ones were failing and replacing them, rather than constructing a sewer. In Mr. Morgan's words, the Ohio EPA informed the county it "would be fruitless and a waste of money" to perform individual tests because over half of the properties had original, dated systems that, as relayed by Mr. Morgan, "would probably fail, and most of those would be required to have off-lot discharging systems, which require individual NPDS permits through the EPA," and the county would "wind up with a sewer system anyway." When it was determined that the Ohio EPA would not test the individual lots in the Subdivision, the county then discussed

16

the possibility of replacing half the systems and, for the remaining lots, utilizing existing NPDS plants nearby.

{¶41} Dean Stoll, supervisor in the Division of Surface Water for the Ohio EPA, testified that the agency was not receptive, environmentally, because the county's proposal indicated that, "of the systems that had been upgraded in that area since 2002, 70 percent of them had to be upgraded with [off-lot] discharging septic systems due to small lot size and poor soil," and the residential systems approved to discharge do not produce high quality effluent as with a municipal wastewater treatment plant. Eventually, the county submitted a proposal to abate the nuisance by installing sanitary sewers for the Subdivision, which the Ohio EPA approved. Mr. Stoll additionally explained that the standard for E. coli in an approved wastewater treatment plant is 126 cts/100ml for a 30-day average, while the standard that demonstrates a public health nuisance in stream concentration, i.e., from household septic systems, is 576 cts/100ml. Mr. Stoll further opined that the boundaries of the assessment district are justified based on his department's testing results and his 28-year experience conducting "thousands of wastewater treatment plant inspections and investigating many communities with similar sewage issues."

{¶42} Dave Sage, the Health District's Environmental Health Director, testified that the typical "life expectancy" of a household septic system is between 20-25 years. His estimate of the number of original off-lot discharging systems in the Subdivision—62—differed slightly from Mr. Morgan's estimate of 66. Mr. Sage testified there is only a five percent "pass rate" for these systems during point-of-sale inspections conducted by the department. He also testified that testing each off-lot discharging system would be

17

impractical. Because they all connect to one common tile line, testing would not necessarily be indicative of the water quality and functionality of a particular household system, and sample wells would have to be installed on each of the properties.

{¶43} Steven Oluic, the current Director of Water Resources, testified as to subsequent testing of the Subdivision the department undertook in January and February 2020, due to the probate court intimating at earlier hearings that the amount of testing done was insufficient. Water Resources personnel obtained 27 samples of surface water from drainage ditches along the Henning, Howard, Helmut, Thwing, and Omar roadways, which were analyzed for fecal coliform by an Ohio EPA certified laboratory. The report indicates that fecal coliform was present in 20 of the samples, which were located on all five roadways of the Subdivision. The level of fecal coliform in 5 of those 20 samples (4 located on Henning, and 1 located on Thwing) exceeded the standard of a public health nuisance under R.C. 3718.011 (i.e., greater than 5,000 colonies per 100 milliliters of liquid).

{¶44} We conclude the probate court's finding that the assessment boundaries are arbitrary is not supported by the evidence or the law. As there is no evidence that the Board acted unreasonably or unlawfully, the probate court appears to have improperly substituted its judgment in this regard for that of the Board and must be reversed.

{¶45} Regarding apportionment, R.C. 6117.09(C) "provides for the Probate Court to look at the proper apportionment of the total assessment as between the various property owners based on the cost to the owners compared to the benefit received. This provision provides for a reapportionment of the various portions of the assessment among the property owners." *Northgate*, 1987 WL 11005, at *3. "'In order to be entitled to an

18

injunction against any part of an assessment for the cost of a public improvement against a lot, the owner thereof has the burden of proving that the lot was not enhanced in value as a result of the improvement in an amount equal to the amount of the assessment.'" *Wolfe v. City of Avon*, 11 Ohio St.3d 81, 84, 463 N.E.2d 1251 (1984), quoting *Schiff*, 9 Ohio St.2d 31 at paragraph five of the syllabus. "[T]he landowner must offer sufficient proof of the value of his property before and after the alleged improvement. If the evidence adduced does not sustain the property owner's claim of no enhancement of value, then he fails in his bid for an injunction and the city may proceed to collect the assessment." (Citations omitted.) *Wolfe* at 84; *see also Come Sail Away Condominium Assoc. v. Bd. of Commrs. of Ottawa Cty.*, 6th Dist. Ottawa No. OT-96-034, 1997 WL 195453, *10 (Apr. 18, 1997) ("The property owner bears the burden to establish that the assessed cost materially exceeds the benefit to the property.").

{¶46} Here, the probate court found that, "Since Ms. Eging has a properly functioning septic system, her property is *not* enhanced in value as a result of the proposed sewer improvement in an amount equal to the amount of the assessment. * * * [T]he cost of the improvement * * * will exceed the benefits resulting therefrom when she already maintains a functioning household wastewater (septic) treatment system." (Emphasis sic.)

{¶47} As of the September 24, 2019 public meeting, the cost of the Project was estimated at $4,523,000.00. Mr. Morgan testified that one-third of the cost—approximately $14,000.00 per lot—will be paid by Water Resources through county funds and a $300,000.00 grant from Ohio Public Works Commission. The property owners will be equally assessed the remaining two-thirds of the cost—approximately $28,000.00 per

19

lot.[1] Each household will also be responsible for the cost of connecting to the sewer line and abandoning the septic system, which is approximated at $4,500.00 to $7,500.00 per household, and a bi-monthly sewer bill of $109.00. Mr. Morgan further noted that the county, on numerous occasions, attempted "salary surveys" to obtain grants for the property owners, but the responses were either insufficient or did not meet the income requirements. Mr. Stoll also testified that household septic systems need replaced about every 20 years at substantial up-front costs, thus he does not believe that they are less expensive than a central wastewater treatment system in the long run.

{¶48} Ms. Eging testified that she purchased her home on Howard Drive in May 2010 for $78,000.00. Counsel introduced a copy of the County Auditor's report of her property, which indicates the present appraised value is $118,100.00. Ms. Eging stated that she will not be able to afford the assessment and additional costs of the Project and her property will not receive any financial benefit or increase in value, more than what she will be assessed for the Project, because she has a fully functioning household septic system.

{¶49} In 2012, Ms. Eging replaced her failing household septic system with an on-lot system, as permitted by the Health Department, at a cost of $20,000.00. She testified that she has a "policy" with a septic company that inspects and maintains the system twice a year, which costs her over $200.00 each year. When Ms. Eging became aware of the Project, she submitted her budget to the Board, outlining her financial constraints,

---

1. According to an Environmental Assessment Report dated May 2020, the estimated Project cost is $5,147,182.00, to be financed by a $1 million grant from Ohio Public Works, approximately $500,000.00 from the Ohio Water Development Authority, and an assessment of no more than $33,000.00 to $35,000.00 per household to be paid over 30 years.

20

and "asked them if they could manage to pull out the costs of their new system from what I had left after I had paid my bills, and I didn't hear anything from them."

{¶50} Ms. Eging called Carol Frank, vice president of Tim Frank Septic Tank and Cleaning Company, to testify as to her septic system. Ms. Frank testified that they did not install the system, but company records indicate it was installed in 2012. She testified that "it would not be unusual for a system, especially with just one person in the home, to last 30 years or longer." Ms. Eging has an agreement with the company, since October 2014, to service the aerator motor of her on-lot system and conduct a visual inspection of the leaching tile lines every six months. A copy of the service report is left with Ms. Eging, and a copy is mailed to the Health Department. Ms. Frank testified the system is functioning and there is no evidence of a nuisance or off-lot discharge.

{¶51} We acknowledge that an owner of real property is competent to testify about the market value of that property, even when not qualified as an expert. *Smith v. Padgett*, 32 Ohio St.3d 344, 347, 513 N.E.2d 737 (1987). While Ms. Eging did offer testimony as to the present-day market value of her property, she offered no evidence to support her contention that the Project will not enhance the value of her property in an amount equal to the assessment. *See Burton v. City of Middletown*, 4 Ohio App.3d 114, 119, 446 N.E.2d 793 (12th Dist.1982) (holding it was impossible to determine whether the value of the special benefit conferred did not equal or exceed the amount of the assessment in part because there was no testimony as to the value of the property before or after the improvement). We must conclude, therefore, that Ms. Eging did not offer sufficient proof of the value of her property after the Project to sustain her claim that the tentative apportionment of the assessment should be modified.

21

{¶52} While this court is sympathetic to Ms. Eging's concern that she will face a financial burden as a result of the Project, we conclude that she did not meet her burden of proof in regard to the Board arbitrarily drawing boundaries of the assessment district or to the tentative apportionment of the assessment materially exceeding the benefit to her property. Accordingly, the probate court erred in finding in favor of Ms. Eging under R.C. 6117.09(B) and (C).

{¶53} The Board's third assigned error is well taken.

{¶54} The judgment of the Geauga County Court of Common Pleas, Probate Division, is reversed. Judgment is hereby entered in favor of Geauga County Board of Commissioners.

CYNTHIA WESTCOTT RICE, J., concurs,

MATT LYNCH, J., concurs in part and dissents in part, with a Concurring/Dissenting Opinion.

_____

MATT LYNCH, J., concurs in part and dissents in part, with a Concurring/Dissenting Opinion.

{¶55} I concur with the majority's disposition of the second assignment of error relating to those homeowners who are not parties to this matter since they have no entitlement to relief where an appeal was not sought. However, I find it necessary to address the statutory scheme in relation to sanitary sewers and the unchecked power given to the Ohio EPA in determining when an unsanitary condition exists. I dissent from

22

the majority's holding that the appellant should be included within the boundary for constructing the sanitary sewer, since creating boundaries for all members of a community based on generalizations and speculation is arbitrary.

{¶56} The general statutory provisions relating to unsanitary conditions and the construction of sanitary sewer facilities highlight concerns with the power given to the EPA. Once the EPA receives a complaint requesting the investigation of unsanitary conditions, it is given extensive authority to issue orders that impact homeowners with limited checks on such power. R.C. 6117.34 requires the EPA to investigate unsanitary conditions when a complaint is initiated, and, if it determines construction of sanitary facilities is necessary for public health, the EPA is required to order the board of commissioners that "corrective action be taken," which order the board must obey. R.C. 6117.09 mandates that if such an order is made, "no property owner shall have the right to appeal from the action of the board declaring such improvement necessary." Thus, the persons most greatly impacted by the EPA's decision that there is an unsanitary condition, and who bear the significant financial burden which comes with such a decision, are left without the ability to challenge that decision. The EPA essentially acts as the sole arbiter of conditions warranting construction of a sanitary system, without a direct remedy for property owners as to this decision. This unchecked power is evident in the present case where the Board of Commissioners' attempts to remedy the situation through a recommendation of individual testing and replacement of household septic systems was rejected by the EPA and, instead, the plan accepted was the installation of sanitary sewers for the entire subdivision. While both the local authorities and the

23

Case No. 2020-G-0262

homeowners apparently did not believe constructing a sanitary sewer system was warranted, the EPA ultimately made the decision as to this issue.

{¶57} The involvement of administrative agencies in the day-to-day lives of citizens, as well as the power these agencies wield in decision-making and enforcement, is significant. Unfortunately, such power may be exercised in a manner that is inconsistent, unfair, and oversteps the bounds of entities that are simply not a coequal branch of government, whether by overreach of agency power or through statutory authority allocated to such agencies beyond that which is reasonable.

{¶58} The U.S. Supreme Court in *Natl. Fedn. of Indep. Business v. Dept. of Labor, Occupational Safety & Health Administration*, 595 U.S. ___, 142 S.Ct. 661 (2022), has most recently reaffirmed the principle that the legislature may not abandon its constitutional responsibilities by the grant of unchecked authority to administrative agencies:

> The nondelegation doctrine ensures democratic accountability by preventing Congress from intentionally delegating its legislative powers to unelected officials. Sometimes lawmakers may be tempted to delegate power to agencies to "reduc[e] the degree to which they will be held accountable for unpopular actions." R. Cass, Delegation Reconsidered: A Delegation Doctrine for the Modern Administrative State, 40 Harv. J. L. Pub. Pol'y 147, 154 (2017). But the Constitution imposes some boundaries here. *Gundy* [*v. United States*], 588 U.S. [__, 139 S.Ct. 2116, 2131, 204 L.Ed.2d 522] (GORSUCH, J., dissenting). If Congress could hand off all its legislative powers to unelected agency officials, it "would dash the whole scheme" of our Constitution and enable intrusions into the private lives and freedoms of Americans by bare edict rather than only with the consent of their elected representatives. *Department of Transportation v. Association of American Railroads*, 575 U.S. 43, 61, 135 S.Ct. 1225, 191 L.Ed.2d 153 (2015) (ALITO, J., concurring); see also M. McConnell, The President Who Would Not Be King 326-335 (2020); I. Wurman, Nondelegation at the

24

Case No. 2020-G-0262

Founding, 130 Yale L. J. 1490, 1502 (2021).

*Id.* at 669 (Gorsuch, J., concurring).

{¶59} This concern with the unchecked power of administrative agencies is not a new one. Over 65 years ago, it was observed that "[t]he rise of administrative bodies probably has been the most significant legal trend of the last century[.] * * * They have become a veritable fourth branch of the Government, which has deranged our three-branch legal theories * * *." *Fed. Trade Comm. v. Ruberoid Co.*, 343 U.S. 470, 487, 72 S.Ct. 800, 96 L.Ed. 1081 (1952) (Jackson, J., dissenting) (administrative agencies "have begun to have important consequences on personal rights").

{¶60} Overreach or unchecked power by administrative agencies impacts all citizens of this country. In *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 313, 315, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013) (Roberts, J., dissenting), Chief Justice John Roberts observed that "the danger posed by the growing power of the administrative state cannot be dismissed," emphasizing that the administrative state "wields vast power and touches almost every aspect of daily life." (Citation omitted.) As he aptly observed, "[t]he Framers could hardly have envisioned today's 'vast and varied federal bureaucracy' and the authority administrative agencies now hold over our economic, social, and political activities." (Citation omitted.) *Id.* at 313.

{¶61} While the administrative agencies within our country serve a valid purpose, their power to act in a role that goes beyond the scope of reasonable authority undercuts citizens' rights and expectations to due process and confuses the role of the different branches of our government. Allowing the EPA to make decisions which require construction of a sewer system for which a homeowner must pay without the ability to

25

seek complete judicial review, and to order that the municipal authorities construct such a sewer, provides it with power beyond that which is reasonable and fair to citizens of an impacted community.

{¶62} As the United States Supreme Court has clarified, EPA regulations do not evade judicial review and statutory regulations are not "designed to enable the strong-arming of regulated parties into 'voluntary compliance' without the opportunity for judicial review." *Sackett v. E.P.A.*, 566 U.S. 120, 131, 132 S.Ct. 1367, 182 L.Ed.2d 367 (2012). Where the Ohio EPA's decision that a sanitary system is necessary requires community members to be part of that system without being able to challenge its necessity, there is an element of "strong-arming" which should be called into question. The fact that property owners do have a right to appeal the boundaries and assessment for the system does not fully alleviate this concern since the review is incomplete and provides limited relief to homeowners.

{¶63} This limited review occurs where those appealing the boundaries of the sanitary sewer assessment district are grouped with all members of their subdivision without consideration of their specific circumstances. The majority holds that, as to the assessment boundaries, the sewer connection requirement is uniformly applicable and there was evidence of septic system failure throughout the subdivision, thereby justifying inclusion of appellant within the boundary. This conclusion, which essentially determines that all individuals living in the same neighborhood or subdivision should be treated the same, must be questioned. A party is permitted a right to appeal the boundaries of the assessment district under R.C. 6117.09. The purpose of an appeal questioning the boundaries, however, is eviscerated if the courts merely determine that the boundaries

26

are not subject to dispute if there is septic system failure somewhere in the neighborhood or vicinity. If parties cannot challenge the particulars of their inclusion in the boundary, the statutory right to appeal this issue has little value. While recognizing that *DeMoise v. Dowell*, 10 Ohio St.3d 92, 461 N.E.2d 1286 (1984), does not require a case-by-case determination, this conclusion is respectfully questioned as, particularly in cases like the one here, the potential for an unfair or arbitrary result is high. *Id.* at 96.

{¶64} Furthermore, the justifications provided by the majority in this matter for including appellant within the boundary are unconvincing. The majority emphasizes testimony that "of the systems that had been upgraded in that area since 2002, 70 percent of them had to be upgraded with [off-lot] discharging septic systems due to small lot size and poor soil." Using this statement to justify appellant's inclusion fails to recognize that 30 percent of lots did not have this issue. This is not an insignificant percentage and certainly does not demonstrate any problems with the septic system on appellant's property. Similarly, the majority also cites to the testimony that half of the systems were old and dated and would likely fail. However, appellant's evidence showed that her system had been installed in 2012 and could last thirty years. Thus, although it was not an "old, dated system" it was treated the same as others that had failed. It has been held that R.C. 6117.09(B) "permits the Probate Court to look at the boundaries of the assessment district—that is to determine whether or not certain lots and/or areas will be benefited by the improvement, and therefore included in or out of the district." *In re Northgate Special Assessments*, 5th Dist. Guernsey Nos. CA-823 to CA-825, 1987 WL 11005, *3 (May 12, 1987). Here, the benefit to appellant is questionable, given that there is nothing showing her property lacks a working septic system or will be in need of a new

27

one in the near future.  Where a party faces a bill in excess of $30,000 to comply with the EPA's determination, use of generalizations to justify that outcome are reasonably viewed as arbitrary.  An "arbitrary" decision is made "without consideration of or regard for facts [or] circumstances."  *Black's Law Dictionary* 125 (10th Ed.2014).  In this case, the consideration of facts is disregarded in favor of generalizations.

{¶65}  In addition, the analysis of the evidence relating to the location of the fecal coliform which exceeded the standard of public health nuisance also does not support inclusion of appellant in the assessment boundary.  The test results demonstrate that samples in excess of the standard were collected on only two roads in the subdivision, Henning and Thwing.  Appellant's property is located on Howard Drive, where no samples were taken exceeding the standard, yet is placed in the same grouping with those homes located on streets where the actual public health nuisance was located.  This again is arbitrary, as the boundary encompassing an entire subdivision is not based on nuisance but apparent convenience or proximity.  The boundary would more reasonably be based on the data itself and confined to the streets where the nuisance was proven.  The foregoing is particularly true given that "[t]he rights related to property, i.e., to acquire, use, enjoy, and dispose of property, * * * are among the most revered in our law and traditions."  *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, ¶ 34.

{¶66}  Without a valid rationale for including all streets in the subdivision instead of only those impacted, this decision is arbitrary.  Deciding boundaries by grouping together all houses in this subdivision is not consistent with the appellant's right to appeal and be afforded due process.  I would affirm the judgment of the trial court as to appellant

28

and determine her property is not included in the boundaries created for the sewer system installation.

{¶67} For the foregoing reasons, I dissent as to the decision to reverse the lower court regarding appellant's property but concur as to those owners who did not appeal.

Case No. 2020-G-0262